DISTRICT OF COLUMBIA et al., Appellants,

v.

The WASHINGTON HOME OWNER-SHIP COUNCIL, INC., Appellee.

No. 79-1053.

District of Columbia Court of Appeals.

Argued En Banc Nov. 26, 1979.

Decided May 28, 1980.

David P. Sutton, Asst. Corp. Counsel, Washington, D. C., with whom Judith W. Rogers, Corp. Counsel, Richard W. Barton, Deputy Corp. Counsel, and James J. Stanford, Asst. Corp. Counsel, Washington, D. C., were on brief, for appellant District of Columbia.

Jerry D. Anker, Washington, D. C., with whom Leslie D. Michelson and Kerry Alan Scanlon, Washington, D. C., were on brief, for appellants Metropolitan Washington Planning and Housing Association, Inc., et al.

Stephen M. Sacks, Washington, D. C., with whom Thomas E. Silfen and Linda G. Moore, Washington, D. C., were on brief, for appellee.

Before NEWMAN, Chief Judge, and KELLY,* KERN, GALLAGHER, NEBE-KER, HARRIS, MACK, FERREN, and PRYOR, Associate Judges.

FERREN, Associate Judge:

This case presents one question: under the District of Columbia Self-Government

* Associate Judge KELLY participated at oral argument but not in the decision of this case.

and Governmental Reorganization Act (Home Rule Act), D.C.Code 1979 Supp., § 1–146(a), does the District Council have authority to respond to "emergency circumstances" by adopting successive, substantially identical 90-day acts addressed to the same, ongoing emergency, without a second reading or congressional review, as is required for passage of permanent legislation? Alleging that the Council does not have such authority, The Washington Home Ownership Council, Inc. (WHOC)[1] brought a three-count action for declaratory and injunctive relief against the District of Columbia, challenging the validity of three series of emergency acts imposing moratoriums on conversion of rental property to condominium and cooperative units, and regulating the sale of converted units. The Metropolitan Washington Planning and Housing Association, Inc. and a group of

tenants' organizations intervened as defendants.[2] After a hearing on cross-motions for summary judgment, the trial court ruled for the plaintiff, WHOC.[3] The court accordingly enjoined enforcement of the one challenged act then in effect, the Emergency Condominium and Cooperative Conversion Stabilization Act of 1979, E.A. 3–95 (approved August 27, 1979). The District and the intervenors have appealed.[4] We affirm the trial court's judgment.

## I.

On occasion we have interpreted the Home Rule Act to determine whether the Council had exceeded its authority. For example, in *McIntosh v. Washington*, D.C. App., 395 A.2d 744 (1978), we upheld the Council's authority to enact the Firearms Control Regulations Act of 1975, whereas in

---

1. WHOC is a nonprofit corporation having members engaged in ownership, brokerage, development, and management of real estate in the District of Columbia, including rental, condominium, and cooperative housing.

2. Metropolitan Washington Planning and Housing Association, Inc., is a nonprofit corporation that represents and assists low and moderate income persons in need of housing in the Washington, D.C. metropolitan area. The other intervenor-defendants are Towne Towers, Aristocrat Tenants Association, Dorchester Tenants Association, Mintwood Tenants Association, Park Regent Tenants Association, Covington Tenants Association, and Arundel Tenants Association.

3. In reaching this result, the trial court held that counts two and three, challenging emergency acts superseded by permanent legislation, were not moot. On appeal, the District questions that ruling. We note, first, that unquestionably there was a justiciable controversy at the time the trial court ruled, for an emergency act in the series of acts challenged in count one was still in effect, presenting legal issues identical to those raised in counts two and three. A substantially identical successor to that emergency act was in force when this case was argued before the en banc court. *See* Appendix. That successor act, however, has since been superseded by permanent legislation, the Condominium and Cooperative Stabilization Act of 1979, which became D.C.Law 3–53 on February 23, 1980. Nonetheless, even this development does not moot the issue of the Council's power to enact substantially identical

successive emergency acts; otherwise, as the trial court noted, the Council's practice would be "capable of repetition, yet evading review." *Southern Pacific Terminal Co. v. ICC*, 219 U.S. 498, 515, 31 S.Ct. 279, 283, 55 L.Ed. 310 (1911). A decision on the merits should be rendered if (1) the challenged action is too short in duration to be fully litigated prior to its cessation or expiration, and (2) we can reasonably expect that the same complaining party will be subject to the same action again. *See Weinstein v. Bradford*, 423 U.S. 147, 149, 96 S.Ct. 347, 348, 46 L.Ed.2d 350 (1975), citing *Sosna v. Iowa*, 419 U.S. 393, 95 S.Ct. 553, 42 L.Ed.2d 532 (1975). This case demonstrates the difficulty of obtaining review of the validity of a series of successive emergency acts before they are superseded by permanent legislation, even with the utmost effort by the parties and courts to expedite the proceedings. We also have every expectation that the members of WHOC, which have continuing involvement with real estate development in the District, would be subject again to the Council's successive enactment of substantially identical emergency acts if we were to allow that practice to continue. Accordingly, we reach the merits.

4. On October 22, 1979, a division of this court granted a temporary stay of the trial court's order. On November 9, 1979, the full court, because of the "exceptional importance" of the issue presented, ordered that the case be heard initially by the court sitting en banc. D.C. App.R. 40(c).

*Bishop v. District of Columbia*, D.C.App., 411 A.2d 997 (1980) (en banc), we invalidated § 605 of the Revenue Act of 1975, and in *Capitol Hill Restoration Society, Inc. v. Moore*, D.C.App., 410 A.2d 184 (1979), we nullified the Council's effort to confer jurisdiction upon this court for direct review of determinations under the Historic Sites Subdivision Amendment of 1976.

In exercising our review function, we have acknowledged that "the core and primary purpose of the Home Rule Act . . was to relieve Congress of the burden of legislating upon essentially local matters 'to the greatest extent possible, consistent with the constitutional mandate.' D.C.Code 1978 Supp., § 1–121(a)." *McIntosh, supra* at 753 (footnote omitted). We also have stressed, however, that the Act only "delegates to the Council legislative power over 'all *rightful* subjects of legislation within the District.' " *Id.* at 750 n.11 (quoting D.C.Code 1978, § 1–124) (emphasis added). Thus, we have perceived that our role—indeed our duty—is to interpret the Act without undue deference to either legislative body, but always with a central focus: the intent of Congress.[5]

## II.

■ Under the Home Rule Act, the District of Columbia Council is empowered to pass legislation by a majority vote after two readings, at least 13 days apart. D.C. Code 1979 Supp. § 1–146(a).[6] If the Mayor does not veto the act within 10 days, (or if the Council overrides a veto by a two-thirds

---

**5.** Our dissenting colleagues argue from two premises: first, the presumptive validity of the Council's actions and, second, the principle of judicial restraint in reviewing the authority of the Council to act in a particular manner. More specifically, they say:

> [1] There is a fundamental canon of statutory construction which mandates that if a statute is fairly susceptible of two constructions, one which will give it effect, the other which would defeat it, the former is preferred. Coupled with this canon is the strong presumption in favor of the validity of actions by the legislature (in this case the District Council).
>
> * * * * * *
>
> [2] Courts should adhere to the principles of judicial restraint when called upon to review the validity of the authority under which a coordinate branch of government acts. Any restriction on broad authority should be read narrowly and no limitations not expressly imposed by Congress should be inferred. The interpretation of its powers by any branch is to be given great respect. [*Post* at 49, 58 (Citations omitted).]

We cannot agree that these premises help the analysis. As to the first, given the fact that we are dealing with two legislatures, Congress and the District Council, it begs the question to say that the Council's own interpretation of the Home Rule Act should be presumed valid. The Council itself is the result, not the initiator, of the Home Rule Act. The Council's interpretation of its own authority obviously commands great respect, but neither the Council's interpretation nor any opposed to it, is entitled to weight beyond the inherent persuasiveness of the position taken in a particular instance.

As to the second premise, our dissenting colleagues do not question this court's authority— and responsibility—to review the Council's actions here. The cases cited in support of judicial restraint, however, rely substantially on the same proposition advanced to support the dissenters' first argument: the presumed validity of a legislative act. Yet, as already indicated, we are confronted by the potentially conflicting positions of *two* legislative bodies— Congress and the Council—and it is this court's duty to determine whether they can be reconciled. We perceive no principled basis for deferring to the Council's interpretation of the Home Rule Act, apart from the merits of the Council's argument. Although "the interpretation of its powers by any branch is due great respect from the others [,] . . . '[i]t is emphatically the province and duty of the judicial department to say what the law is.' " *United States v. Nixon*, 418 U.S. 683, 703, 94 S.Ct. 3090, 3105, 41 L.Ed.2d 1039 (1974) (quoting *Marbury v. Madison*, 1 Cranch 137, 177, 2 L.Ed. 60 (1803)).

**6.** The Home Rule Act, D.C.Code 1979 Supp., § 1–146(a), provides:

> The Council, to discharge the powers and duties imposed herein, shall pass acts and adopt resolutions, upon a vote of a majority of the members of the Council present and voting, unless otherwise provided in this Act or by the Council. The Council shall use acts for all legislative purposes. Each proposed act (other than an act to which section 47–224 applies) shall be read twice in substantially the same form, with at least thirteen days intervening between each reading. Upon final adoption by the Council each act shall be made immediately available to the public in a manner which the Council shall determine. If the Council determines, by a

vote), it becomes effective after a 30 legislative-day layover in Congress, unless disapproved by concurrent resolution. D.C.Code 1979 Supp., §§ 1–144(e), –147(c)(1).[7] The second-reading requirement was adopted to give notice of a pending proposal so that "the public and interested parties can discuss this legislation" before passage. Staff of the House Comm. on the District of Columbia, 93d Cong., 2d Sess., Home Rule for The District of Columbia 1973–1974 at 1042 (Comm. Print 1974) (hereafter cited as Home Rule History) (statement of Rep. Thomas M. Rees).[8] The 30 legislative-day layover was imposed as an orderly way for Congress to carry out its constitutional responsibility to legislate for the District.[9]

In contrast, the Council may pass "emergency" legislation by a vote of two-thirds of the members if "emergency circumstances make it necessary that an act be passed after a single reading, or that it take effect immediately upon enactment." § 1–146(a). However, "such act shall be effective for a period of not to exceed ninety days." *Id.*

The Council considers a situation to be an emergency when immediate legislative action is required for "[t]he preservation of the public peace, health, safety and general welfare." Emergency Condominium and Cooperative Control Resolution of 1979, Res. 3–126, 25 D.C.Reg. 10370, 10372 (June 1, 1979); *accord, Lifschitz v. City of Miami*

---

vote of two-thirds of the members, that emergency circumstances make it necessary that an act be passed after a single reading, or that it take effect immediately upon enactment, such act shall be effective for a period *of not to exceed ninety days.* Resolutions shall be used to express simple determinations, decisions, or directions of the Council of a special or temporary character.

7. *D.C.Code 1979 Supp., § 1–147(c)(1) provides:*
 Except acts of the Council which are submitted to the President in accordance with the Budget and Accounting Act, 1921 (31 U.S.C. 1 et seq.) [,] any act which the Council determines according to section 1–146(a), should take effect immediately because of emergency circumstances, and acts proposing amendments to title IV of this chapter, the Chairman of the Council shall transmit to the Speaker of the House of Representatives, and the President of the Senate a copy of each act passed by the Council and signed by the Mayor, or vetoed by the Mayor and repassed by two-thirds of the Council present and voting, each act passed by the Council and allowed to become effective by the Mayor without his signature, and each initiated act and act subject to referendum which has been ratified by a majority of the registered qualified electors voting on the initiative or referendum. *Except as provided in paragraph (2), no such act shall take effect until the end of the 30-day period (excluding Saturdays, Sundays, and holidays, and any day on which neither House is in session because of an adjournment sine die, a recess of more than 3 days, or an adjournment of more than 3 days) beginning on the day such act is transmitted by the Chairman to the Speaker of the House of Representatives and the President of the Senate and then only if during such 30-day period both Houses of Congress*

*do not adopt a concurrent resolution disapproving such act.* The provisions of section 1–127, except subsections (d), (e), and (f) of such section, shall apply with respect to any concurrent resolution disapproving any act pursuant to this paragraph. [Emphasis added.]
D.C.Code 1979 Supp., § 1–147(c)(2) authorizes a one-house veto of Council legislation with respect to Titles 22, 23, and 24, on criminal *offenses, criminal procedure, and prisoners and their treatment, respectively.*

8. A second-reading rule is often found in municipal charters; it serves the purpose of permitting the public to participate in the legislative process. *See Town of Burnsville v. City of Bloomington,* 268 Minn. 84, 90, 128 N.W.2d 97, 102 (1964); *Hatfield v. Meers,* 402 S.W.2d 35, 44–45 (Mo.App.1966).

9. Congress has expressly reserved a statutory right "to exercise its constitutional authority as legislature for the District, by enacting legislation for the District on any subject, . . . including legislation to amend or repeal any law in force in the District." D.C.Code 1978 Supp., § 1–126. This statute follows from the constitutional requirement that Congress retain "the power . . . at any time to revise, alter, or revoke the [legislative] authority granted." *D.C. v. John R. Thompson Co.,* 346 U.S. 100, 109, 73 S.Ct. 1007, 1012, 97 L.Ed. 1480 (1953); *see* U.S.Const. art. I, § 8, cl. 17 ("The Congress shall have power to exercise exclusive Legislation in all Cases whatsoever, over such District . . . as may, by Cession of particular States, and the Acceptance of Congress, become the Seat of Government of the United States.").

*Beach,* 339 So.2d 232, 234 (Fla.App.1976), *cert. denied,* 348 So.2d 949 (Fla.1977); *Padberg v. Roos,* 404 S.W.2d 161, 168 (Mo.1966) (en banc).

■ Faced with a serious shortage of rental housing in the District because of widespread conversion of rental housing to condominium and cooperative property, the Council perceived a need "to impose temporary controls on the conversion of rental properties to condominium or cooperative status and thus to stabilize rental housing in the District of Columbia." Res. 3–126, *supra.* Accordingly, to preserve to status quo until permanent legislation could be devised, the Council passed three series of emergency acts imposing moratoriums on such conversion and regulating the sale of converted units.[10]

WHOC does not dispute that the Council acted in response to a genuine emergency.[11] Nor does the District contend that different emergencies prompted adoption of the acts within each count of WHOC's complaint; each count admittedly reflects substantially identical, successive measures directed at the same, ongoing emergency.[12] Thus, all parties agree on the statement of the issue.

The dispute stems from the District's position that the only procedural limitation in § 1–146(a) on passage of "an act" in emergency circumstances is a two-thirds vote of the Council, and that the 90-day temporal limitation refers only to the particular emergency act itself, not more broadly to the substantive provisions of the act. According to the District, there is no prohibition against adoption—without a second

reading or referral to Congress—of successive, substantially identical acts directed at the same emergency.

The trial court rejected this construction. It held "that the Council may not, through its emergency power, continue in effect substantially the same substantive provisions of law for more than ninety days without a second reading of the act." *Washington Home Ownership Council, Inc. v. District of Columbia,* 107 Wash.D.L.Rptr. 1985, 1993 (Nov. 9, 1979). This interpretation accords more closely with the concept announced in the House of Representatives Committee Report on the proposed Home Rule Act, which stated that "[w]hen the Council acts in an emergency fashion, . . . its *action* shall be effective for not more than ninety days." Home Rule History at 1462 (emphasis added). Nonetheless, because the statutory language is not conclusive, we examine the scheme of the Home Rule Act, as illuminated by additional legislative history.

## III.

A. According to WHOC, the Council's "emergency" power in § 1–146(a) to dispense with the second-reading and congressional layover requirements is an exception to the basic scheme, not an alternate route to long-term legislation. More specifically, WHOC challenges the District's view that the 90-day limitation on "such act" is applicable, separately, to *each* emergency act as such, without regard to the substance of the legislation. WHOC argues that this view is inconsistent with the exceptional nature of

10. A chronology of this emergency legislation is set forth in the Appendix to this opinion.

11. We therefore do not reach the question whether the District of Columbia courts may review the validity of the Council's determination that an emergency exists under particular circumstances. State courts are divided on that question of judicial power. *Compare State ex rel. Tyler v. Davis,* 443 S.W.2d 625 (Mo.1969) (en banc) (court will review and decide whether emergency exists) *with State ex rel. Hoppe v. Meyers,* 58 Wash.2d 320, 363 P.2d

121 (1961) (en banc) (legislative determination of emergency is conclusive unless facially false).

12. WHOC also does not dispute that an "emergency" may persist for an extended period. *See United States v. Southern Ry. Co.,* 364 F.2d 86, 94 (5th Cir. 1966), *cert. denied,* 386 U.S. 1031, 87 S.Ct. 1479, 18 L.Ed.2d 592 (1967); *Daugherty Lumber Co. v. United States,* 141 F.Supp. 576, 581 (D.Or.1956) (3-judge court).

the emergency power because it would permit adoption of consecutive emergency acts to the point where they effectively amount to permanent legislation. WHOC stresses that Congress did not intend this alternative to the second-reading and congressional layover requirements.

In reply, the District concedes that under its reading of the statute, the Council could pass an unbroken succession of emergency acts extending over years—as in this case— limited only by the requirement that the Council find an "emergency." The District, therefore, argues in effect that Congress intended two alternative legislative tracks; the Council can choose between regular or emergency legislative procedures solely by reference to its own perception of the circumstances.

The District premises its argument not only on its literal reading of the "such act" clause in § 1–146(a), but also on the protections against abuse inherent in the two-thirds voting requirement for emergency measures. According to the District, Congress intended this additional obstacle to Council action as a sufficient offset to the second-reading and congressional layover requirements. The District argues that the two-thirds vote is an adequate safeguard because no substantial protections are lost when the emergency procedure is used. It stresses that the 90-day limitation on emergency acts effectively serves the purpose of the second-reading requirement, since the public will be on notice after the first such act that citizen efforts may be necessary to forestall, modify, or sustain the legislation after 90 days. As to the congressional layover, the District notes that Congress has authority to override the Council's acts—including emergency acts—at any time, without reference to a formal statutory mechanism for doing so. *See* note 9 *supra.* Thus, according to the District, the second-reading and 30 legislative-day layover requirements, while perhaps convenient to alert the public and focus congressional attention, do not inherently add to protection of public rights or congressional prerogatives.

Contrary to the District's argument, we conclude that WHOC's view of the statutory scheme comports more closely with the structure of the Home Rule Act, reflecting the common-sense notion that an "emergency" prerogative and procedure is extraordinary and should not be substituted freely for the regular procedure. Because the District's position is not wholly implausible, however, we turn to the legislative history.

B. Section 146(a) of the Home Rule Act, as finally adopted, incorporated an amendment offered by Representative Thomas M. Rees, who had initiated the "emergency" concept. *See* Home Rule History at 1042. Rep. Rees originally proposed that emergency legislation could be enacted "[i]f the Council determines that emergency circumstances make it necessary that an act be adopted at a single reading or that it take effect immediately upon enactment." *Id.* Representative Gilbert Gude then suggested requiring a two-thirds vote of the Council for enactment of such measures. Rep. Rees replied:

> Mr. Rees. What I think you're suggesting is a good suggestion. . . . I think that you might amend this to say "if the Council determines by a two-thirds vote that emergency circumstances make it necessary that an act be adopted at a single reading or that it take effect immediately upon enactment, such act shall be effective for a period of not to exceed ninety days." *Usually by a ninety day period, you ascertain whether the act is necessary on a continuing basis and then follow the second and third reading rule and adopt the act which will be a permanent part of the municipal regulations.*
>
> Mr. Washington. Can the majority of the Council determine if an emergency exists?
>
> Mr. Rees. *I think in the emergency situation, it would be best to have a two-thirds majority vote. I think there could be some chain hanky-panky.* We think there is an emergency, they could say

that, and we declare it an emergency. So I would offer an amendment to the amendment. I suggest to the gentleman from Maryland, the last sentence, if the Council by two-thirds vote that emergency circumstances make it necessary that an act be adopted at a single reading or that it take effect immediately upon enactment, and I think this would put the proper safeguard in there. *Then if they want to extend the act past the ninety days, they could obviously follow the second reading rule.* [*Id.* at 1043 (emphasis added).]

Several aspects of this exchange are significant. First, Rep. Rees believed that "usually" 90 days would be a sufficient period for emergency legislation, *i.e.*, for "ascertain[ing] whether the act is necessary on a continuing basis." *Id.* Second, he implicitly acknowledged that emergencies could last beyond 90 days, but in that case, he asserted, the problem should be resolved by tacking permanent legislation onto a single emergency act. In the event the Council "want[s] to extend the act past the ninety days, they could obviously follow the second reading rule." *Id.* Third, Rep. Rees also apparently assumed that any problem could be addressed legislatively without a gap between emergency and permanent legislation, although there is no evidence in the Home Rule History that he—or anyone else—knew at the time how realistic that belief actually might turn out to be.[13] Finally, the reference to possible "chain hanky-panky" reinforces the view that a second, substantially identical emergency act in lieu of a second reading was not to be permitted.

The District argues, to the contrary, that Rep. Rees' acceptance of "a two-thirds ma-

jority vote" in the sentence immediately preceding his remarks about "chain hanky-panky" supports its view that Congress contemplated successive emergency acts, subject only to the limitation inherent in the more difficult, two-thirds voting requirement. We do not agree. The two-thirds requirement, suggested initially by Rep. Gude, was directed fundamentally against the Council's precipitous use of emergency power in *any* situation; a two-thirds vote is required even for passage of a single emergency act. Given Rep. Rees' own conclusion that if the Council "want[s] to extend the [emergency] act past the ninety days, they could obviously follow the second reading rule," we do not believe his acceptance of the two-thirds voting requirement was an endorsement of a potentially unlimited number of successive emergency acts. To the contrary, in context, Rep. Rees' reference to "chain hanky-panky" is best interpreted as a general concern about overuse of the emergency power in ways that bypass the second-reading rule.

In summary, based on Rep. Rees' remarks and the House Committee report that an emergency "action shall be effective for not more than ninety days," Home Rule History, *supra* at 1462, we conclude that the legislative history supports WHOC, not the District.

C. The District argues that whatever the structure of the Home Rule Act or its legislative history otherwise might suggest, a congressional intent to permit successive 90-day acts must be inferred from the addition of the congressional layover requirement—one of the later legislative developments. *See* note 13 *supra*.

The District points out that, in the Council's experience, emergency situations com-

13. Rep. Rees made these remarks almost three months before Congress, at the behest of Rep. Charles Diggs, added the 30 legislative-day layover provision to the Act. *See* Home Rule History, *supra* at 1043, 2084, 2228, 2318–19. The House Committee Report stating that an emergency "action shall be effective for not more than ninety days," Home Rule History, *supra* at 1462, also was written prior to addition of the congressional layover requirement—

but after Rep. Rees' statements. There is no other legislative history indicating whether addition of the congressional layover affected the views of Rep. Rees or other members of Congress on the feasibility of "tacking" permanent legislation onto a single emergency act and, consequently, on the scope of the Council's authority to adopt successive emergency legislation.

monly continue well beyond 90 days. It stresses that the most appropriate, permanent legislative solution usually requires time-consuming care in its development and may evolve months after the original 90-day act has expired. Even in the best of circumstances, when the legislative solution is clear, the ordinary legislative machinery, with its elaborate hearing procedure—and a 30 legislative-day congressional layover— simply does not allow for permanent legislation within 90 days of the first emergency act.[14] A gap between expiration of 90-day legislation and congressionally-approved permanent legislation is virtually inevitable, the District says; and, as in the case of rampant condominium conversion, the failure to bridge that gap legislatively can be disastrous to the public welfare. Given such realities, the District argues that Congress cannot have intended to limit the Council to one emergency act in an ongoing emergency situation; Rep. Rees' comments about "chain hanky-panky" and the use of "the second reading rule" become, in effect, obsolete in light of the congressional layover provision proposed later. *See* note 13 *supra.*

This contention is substantially premised on the assumption that the only acceptable "permanent legislation" that can succeed an emergency act is a thoughtfully developed, "permanent" solution to the problem. Obviously, the Council's hearing procedures, careful study in committee, the process of amendment, the Mayor's role, and the congressional layover make it doubtful that, in a situation as complex as the wave of condominium conversions, a definitive solution can be designed and implemented within 90 days. But this argument overlooks a crucial point: as the Council itself has recognized, it can use its regular legislative authority to deal with the problem on an interim basis.[15] There is no reason why the solution adopted in the first emergency act

**14.** D.C.Code 1978 Supp., § 1–144(c) provides: "The Council shall adopt and publish rules of procedures which shall include provisions for adequate public notification of intended actions of the Council." The Council, in response, has adopted Rules of Organization and Procedures, Res. 3–53, 25 D.C.Reg. 9343 (April 13, 1979). These are described as follows in the District's motion for summary reversal:

Rule 709 requires a 15 day period for publication of the proposed enactment (25 DCR 9376). Moreover, if hearings are contemplated, Rule 902 requires an additional notice of 'not less than fifteen (15) days prior to the date of the hearing' (25 DCR 9384). Following hearings and/or citizen input, and deliberation by the appropriate Committee of the Council, a report is prepared and filed with the Council's Secretary. (See Rules 502(a), 506, 25 DCR 9362, 9367–9368.) The Secretary then schedules the proposed bill for review at a 'work session' by the Committee of the Whole (COW) which consists of the entire Council. Work sessions of this kind are held *every other week, i.e.,* alternating with legislative sessions (Rule 404, 25 DCR 9354). Following COW review and approval, the proposed measure is scheduled for consideration at ensuing legislative sessions at which it must 'be read twice in substantially the same form with at least thirteen days intervening between each reading' (§ 412(a) *supra* ). If passed following the second reading, the act is transmitted to the Mayor, who in turn has

'ten calendar days (excluding Saturdays, Sundays, and holidays) after it is presented to him' to consider it with a view to approval or disapproval (§ 404(e)). If vetoed by the Mayor, the Council is given 30 days to override his veto by a vote of two-thirds of the members present and voting. Id. If the Mayor approves the measure, it is then transmitted to Congress where it must lie for a 30-day review period before taking effect. This layover period is far more lengthy than 30 *calendar* days because it excludes 'Saturdays, Sundays, holidays and any day on which neither House is in session because of an adjournment *sine die*, a recess for more than 3 days, or an adjournment of more than 3 days.' § 602(c), as amended, D.C.Code, § 1–147(c) (Noncum. Supp. VI, 1979). At times, this 30-day period may span many months; for example, if an act transmitted to Congress does not complete the 30-day period before an adjournment *sine die*, the act must begin the 30-day period anew after the reconvening of the next Congress. See 3 Op. C.C.D.C. 524 (1978). These circumstances do not take into consideration such matters as the length of hearings, the time required for careful legislative drafting, and the fact that publication in the D.C. Register of intended actions occurs but once weekly.

**15.** The Council used the regular legislative process to pass the Cooperative Conversion Moratorium Act, Act No. 1–71, D.C.Code 1978 Supp., § 29–801, which imposed a 180-day moratorium on cooperative conversions.

cannot be proposed simultaneously as "permanent" legislation, as Rep. Rees suggested. The "permanent" legislation could be effective for a specified period, *e.g.*, six or nine months, *see* note 15 *supra*, with a reasonable expectation that it could be effective (after a second reading, consideration by the Mayor, and a congressional layover) within 90 days of the first reading.[16]

It is true that in order to adopt permanent legislation within 90 days, the Council first would have to adopt abbreviated hearing procedures for use on those occasions when it declares emergency circumstances, in order to assure that a second reading and passage could occur not long after 13 days from the first reading. *Compare* note 16 *supra with* note 14 *supra*. The need to abbreviate hearing procedures in emergency circumstances, however, does not detract from the reasonableness of this alternative to successive emergency enactments, since there is no statutory requirement that binds the Council to any particular hearings. *See* D.C.Code 1979 Supp., § 1–144(c).[17]

We agree with the District that this approach puts a premium on pushing temporary solutions through the full legislative process, and that it may detract from the most orderly legislative consideration of a problem by forcing the Council and Mayor to spend time on legislation known to be an incomplete, even flawed response to the problem. But this does not make the approach so unworkable that we can infer Congress must have intended (by virtue of the layover provision or otherwise) to permit consecutive emergency acts. The fact is, the succession of emergency acts at issue in this case imposed solutions over a long period of time that were no more complete than those available through the suggested combination of emergency and regular procedures. The District, therefore, is not in a position to argue that its sustained "emergency" approach to the problem, without a second reading or congressional layover, necessarily brings such a superior legislative response that Congress manifestly intended it as a valid alternative to permanent legislation. *Cf. SEC v. Sloan*, 436 U.S. 103, 115, 98 S.Ct. 1702, 1710, 56 L.Ed.2d 148 (1978) (SEC is not empowered to impose successive suspensions of trading although alternative remedies were "more cumbersome").

We conclude that Congress, fundamentally, required a second reading and congres-

---

**16.** If an emergency act were used as a first reading, to be followed by the ordinary legislative sequence as suggested by Rep. Rees (quoted in the text above), the virtually ideal timetable, requiring 71 days, would be as follows:

| Action | Day |
| --- | --- |
| Emergency act (first reading) | 1 |
| Second reading; submission to Mayor | 15 * |
| Approval by Mayor; submission to Congress | 29 ** |
| End of congressional layover without disapproval | 71 *** |

\* Assumes the required 13-day interval and no substantial changes, which would require an additional reading. D.C. Code 1979 Supp., § 1–146(a).

\*\* Assumes 10 days plus two weekends: the full "ten calendar days (excluding Saturdays, Sundays, and holidays) after the act is presented to him." D.C. Code 1979 Supp., § 1–144(e). If the Mayor instead disapproved, the Council would have up to 30 days to override the veto. *Id.*

\*\*\* Assumes 30 days plus six weekends and no recesses or adjournments of more than three days; *i. e.,* the full 30 days "excluding Saturdays, Sundays, and holidays, and any day on which neither House is in session because of an adjournment sine die, a recess of more than 3 days, or adjournment of more than 3 days." D.C. Code 1979 Supp., § 1–147(c)(1).

**17.** Contrary to the suggestion of our dissenting colleagues, *see post* at 1371 n.5, adoption of abbreviated hearing procedures for use in emergency circumstances would not alter the hearing procedure for adoption of permanent legislation in ordinary circumstances, unaccompanied by declaration of an emergency. Thus, when permanent legislation is not initiated by an emergency enactment, the Council could still proceed under its present regulations. Our point is that the required second reading before extension of an emergency act beyond 90 days puts the public on notice of the longer-term action the Council is about to take, without limiting the Council to particular hearing procedures.

sional layover as necessary safeguards whenever long-term legislation is adopted. The proponents of the amendment authorizing emergency legislation (most notably Rep. Rees) cannot be understood to have compromised the second-reading requirement when they proposed the two-thirds voting requirement for emergency acts; and the later addition of the 30 legislative-day congressional layover cannot be said to have imposed such a burdensome requirement that its very adoption manifests an eventual congressional decision to tolerate an unlimited number of consecutive, substantially identical emergency acts by the Council, as a way of overcoming that burden.

D. The District argues, finally, that despite any adverse implication from the initial legislative history, Congress made clear its intent, favoring the District's interpretation, in adopting the 1978 amendments to the Home Rule Act. These allegedly show that Congress was aware of, and thus implicitly approved, the Council's regular use of consecutive, nearly identical emergency acts.[18]

We cannot agree. It is true the House committee report acknowledged that "[t]he unpredictability [of the congressional review process] has forced the District to enact an inordinate amount of temporary (90-day) 'emergency legislation'," note 18 supra; but the report did not focus on the legality of successive emergency acts and

did not express approval of the District's actions. See Sloan, supra at 120–21, 98 S.Ct. at 1713–14. More importantly, Congress responded to the acknowledged problem of delay in final passage of Council acts by affirmatively rejecting a recommendation that, in the interest of Congress, the layover should be increased to 60 days; instead, Congress retained a 30 legislative-day layover and even adjusted the calculation of legislative days in the District's favor. See D.C.Code 1979 Supp., § 1–147(c)(1); note 18 supra.[19] Congress thereby reaffirmed that the 30 legislative-day period for review is compatible with the Council's needs, including the ability to deal with emergencies. We cannot construe Congress' 1978 acknowledgment of the Council's emergency legislation to be, in addition, a reinterpretation of legislative intent or an amendatory endorsement of the Council's practice. See Haynes v. United States, 390 U.S. 85, 87 n.4, 88 S.Ct. 722, 725, 19 L.Ed.2d 923 (1968) ("The views of a subsequent Congress of course provide no controlling basis from which to infer the purposes of an earlier Congress"); United States v. Price, 361 U.S. 304, 313, 80 S.Ct. 326, 331, 4 L.Ed.2d 334 (1960) (earlier congressional intent will not be inferred from a later amendment). The better interpretation of Congress' attitude is a willingness to forbear from joining issue on the problem.

IV.

We have reviewed the language of § 1–146(a), the overall legislative process under

18. The Council's practice was noted in H.R. Rep.No.95–1104, 95th Cong., 2d Sess. at 23 (1978):

Perhaps the most difficult and burdensome aspect of section 602(c), the congressional review process, is the uncertainty of when an act passed by the Council will become law. . . . At its worst, as in the case of the Condominium Act of 1976 (D.C.Act 1–151), seven months elapsed before the act became law. The unpredictability has forced the District to enact an inordinate amount of temporary (90-day) "emergency legislation" that requires no congressional review and takes effect immediately.

Although the Task Force recommended a review period of 60 calendar days, the committee feels that 30 calendar days, excluding

weekends, holidays and recesses or adjournments over three days, will allow sufficient time for Congress to act on a disapproving resolution if one were introduced. This span of time would have accommodated any disapproving resolutions previously introduced.

19. As indicated in D.C.Code 1979 Supp., § 1–147(c)(1) and the Committee report cited in note 18 supra, the 30 legislative-day period now excludes only days in which "neither House is in session because of an adjournment sine die, a recess of more than 3 days, or an adjournment of more than 3 days." § 1–147(c)(1). Thus, after the 1978 amendments, a three-day recess or adjournment would be counted in the 30-day layover.

the Home Rule Act, the legislative history, and the workability of the "emergency" and "permanent" legislative provisions in conjunction. We agree with WHOC and the trial court.

We conclude, in summary, that Congress intended the Council's emergency power to be an exception to the fundamental legislative process requiring a second reading and congressional layover; it is not an alternative legislative track to be used repeatedly whenever the Council perceives an ongoing emergency. We read the legislative history, especially as elaborated by Rep. Rees, to underscore that the Council must follow the "permanent" legislative route whenever it concludes that emergency circumstances demand legislative protection beyond a 90-day emergency act. The fact that Congress, even when adopting the 1978 amendments to the Home Rule Act, may not fully have appreciated the difficulties it had imposed on the District, does not alter our reading of what Congress has required.

Finally, the District has not shown that a 90-day limit on substantive legislation enacted by way of the Council's emergency power under § 1–146(a) is incompatible with the need for a responsive legislative process in the District of Columbia. Nothing in the structure of the home rule legis-

lative scheme, as applied to the realities faced by the Council, compels a conclusion that Congress must have contemplated the possibility of consecutive, virtually identical 90-day acts by the District Council in response to the same emergency.[20] We believe the District's arguments are strained in comparison with the interpretation advanced by WHOC and adopted by the trial court.[21]

We therefore hold that when the Council, by a two-thirds vote after a single reading, enacts legislation in response to emergency circumstances, as authorized by D.C.Code 1979 Supp., § 1–146(a), that act "shall be effective for a period of not to exceed ninety days," id., and the Council has no authority to pass another substantially identical emergency act in response to the same emergency.

Consistent with the declaratory relief inherent in our construction of § 1–146(a), we also affirm the trial court's injunction against implementation of the Emergency Condominium and Cooperative Conversion Stabilization Act of 1979, E.A. 3–95.[22] The trial court's declaratory relief, coupled with an immediate injunction, could not have taken the District by surprise because the former Corporation Counsel warned the District Council about the possible illegality

---

**20.** As indicated at note 16 *supra*, we premise our analysis of the District's "structural" argument on an assumption that Congress is in session, such that the 30-day layover period can run interrupted only by weekends and holidays. We do not foreclose the argument that a congressional recess after enactment but before the 30-day period has run may create a different emergency permitting a second, consecutive emergency act.

**21.** In interpreting the language used in § 1–146(a), in the context of the overall legislative scheme, we take the approach used by the Supreme Court in *Sloan, supra*. There, the Court held that the Securities and Exchange Commission did not have power to order successive suspensions of trading under a statutory provision permitting it "summarily to suspend trading in any security . . . for a period, not exceeding ten days" for the protection of the public. *Id.* 436 U.S. at 105, 98 S.Ct.

at 1706 (quoting 15 U.S.C. § 78*l*(k) (1976)). The Court concluded that successive 10-day suspensions unlawfully bypassed notice and hearing procedures in other sections of the statute designed to protect the issuer's rights. Although the contexts are different, *Sloan* is strong authority for the propositions that an overall legislative scheme must be carefully evaluated, and that express provisions against arbitrary action—here the second-reading and congressional layover requirements—should not be subordinated to summary procedures, absent clear congressional intent or compelling indications in the statute.

**22.** This Act apparently has expired and has been superseded by permanent legislation. *See* Appendix. We leave it to the parties and the trial court to evaluate the legal effect of this injunction.

of such successive emergency legislation.[23] On the other hand, Congress was aware of the issue while considering the 1978 amendments to the Home Rule Act and was not inclined to take it on directly. Furthermore, the parties have stipulated to the existence of numerous emergency acts which this opinion may affect, and yet we are not in a position, on this appellate record, to evaluate the impact of our decision in these other contexts. Nor, finally, are we in a position to evaluate the implications of this opinion for the validity of unchallenged, successive emergency acts which have expired. *Cf. American Bankers Association v. Connell* (D.C.Cir.1979), *cert. denied,* 444 U.S. 920, 100 S.Ct. 240, 62 L.Ed.2d 176 (1979) (judgment invalidating bank fund transfer systems recognized as potentially disruptive of private investment and the public interest; judgment stayed for over eight months to permit congressional response).[24]

Recognizing, therefore, that the District requires an appropriate interval in which to deal with its emergency legislation, we shall stay for 90 days the mandate to be issued upon this opinion and order. *See Buckley v. Valeo,* 424 U.S. 1, 142–43, 96 S.Ct. 612, 693–94, 46 L.Ed.2d 659 (1976); *Junghans v. Department of Human Resources,* D.C. App., 289 A.2d 17, 26 (1972); *American Bankers Association, supra.*

*So ordered.*

### APPENDIX

The emergency enactments challenged in WHOC's complaint are: *

#### A. *Count One*

On December 4, 1979, after two readings, the Council passed the Condominium and Cooperative Conversion Stabilization Act No. 3–143, which was signed by the Mayor on December 21, 1979. The act imposes a 180-day moratorium on cooperative and condominium conversions, with specified exemptions to be determined by the Mayor. The act became D.C.Law 3–53 upon expiration of the congressional review period on February 23, 1980.

This permanent legislation was preceded by the following emergency acts:

1. *Emergency Condominium and Cooperative Stabilization Act of 1979,* E.A. 3–44, approved May 29, 1979. [25 D.C.Reg. 10363]

Accompanied by Resolution 3–126, May 22, 1979, this act imposed a 90-day moratorium on condominium and cooperative conversions, and established the Emergency Condominium and Cooperative Conversion Commission to study the subject and recommend permanent legislation to address problems of low-moderate income tenants who would experience difficulty buying units upon conversion. In setting forth the circumstances deemed to constitute an emergency, the resolution stated:

> The preservation of the public peace, health, safety and general welfare necessitates an emergency act to impose temporary controls on the conversion of rental properties to condominium or cooperative status and thus to stabilize rental housing in the District of Columbia.

2. *Emergency Condominium and Cooperative Conversion Stabilization Act of 1979,* E.A. 3–95, approved August 27, 1979. [26 D.C.Reg. 1014]

This act was accompanied by Resolution 3–201, July 31, 1979, which is identical to Resolution 3–126, *supra.*

---

**23.** *See Comments on EA 1–86: Emergency Cooperative Regulation Act of 1976,* 1 Opinions of the Corporation Counsel 424 (Jan. 11, 1977); *The Emergency Legislation Authority of the Council,* 1 Opinions of the Corporation Counsel 467 (Feb. 16, 1977); *Comments on EA 2–133, the "First Emergency Housing Discontinuance Regulation Act of 1978,"* 3 Opinions of the Corporation Counsel 258 (July 27, 1978).

**24.** The circuit court's reasons are set forth in an unpublished judgment. The disposition itself is acknowledged at 595 F.2d 887 (1979).

* The following description of the legislation at issue closely follows the trial court's clear and comprehensive discussion contained in its Opinion and Order of October 19, 1979.

3. *Condominium and Cooperative Conversion Stabilization Emergency Act of 1979*, E.A. 3–132, approved November 23, 1979.** [26 D.C.Reg. 2436]

This act was accompanied by Resolution 3–277, November 20, 1979, stating that permanent legislation has been favorably reported out of committee, but that it could not be made effective until 1980. The provisions are otherwise substantially identical to those contained in Act No. 3–95 and Resolution 3–201, *supra*.

4. *Condominium and Cooperative Stabilization Emergency Act of 1980*, E.A. 3–151, approved February 20, 1980.** [27 D.C.Reg. 849]

This act was accompanied by Resolution 3–335, February 20, 1980, stating that permanent legislation would not become effective until after the expiration of E.A. 3–132. The provisions are otherwise substantially identical to those contained in Act No. 3–95 and Resolution 3–201, *supra*.

B. *Count Two*

Following enactment of two emergency moratorium acts,*** the Council, after two readings, enacted and submitted to Congress the Cooperative Conversion Moratorium Act, D.C.Law 1–71, D.C.Code 1978 Supp., § 29–801. It became law on June 19, 1976, at the expiration of the 30-day congressional review period. This law provided for a 180-day moratorium on cooperative conversions, expiring on November 3, 1976. The report of the Council's Committee on Housing and Urban Development which accompanied the bill stated that the 180-day moratorium was needed to allow the Council time to "construct and offer permanent legislation which will serve to govern the establishment and conduct of cooperative housing accommodations in the District."

Following expiration of the 180-day moratorium, the Council passed and the Mayor approved 10 successive emergency acts which continued the moratorium in force:

1. *Emergency Cooperative Regulation Act of 1976*, E.A. 1–189, approved January 3, 1977. [23 D.C.Reg. 4941]

This act was accompanied by Resolution 1–434, December 7, 1976, finding emergency circumstances in the fact that the congressionally-approved 180-day moratorium would expire before the Council (given its "legislative schedule") could enact "comprehensive legislation," and that "chaos . . . in the housing market" would result from termination of the moratorium prior to enactment of comprehensive legislation. 23 D.C.Reg. 4275.

2. *Emergency Cooperative Regulation Act of 1977*, E.A. 2–13, approved March 18, 1977. [23 D.C.Reg. 7683]

Accompanied by Resolution 2–38, March 8, 1977, 23 D.C.Reg. 7699, this act follows the language of the first emergency moratorium (E.A. 1–189, *supra*), and is based on the same emergency circumstances.

3. *Second Emergency Cooperative Regulation Act of 1977*, E.A. 2–47, approved June 17, 1977. [24 D.C.Reg. 207]

This Act and accompanying Resolution 2–100, June 14, 1977, 24 D.C.Reg. 111, are the same as their predecessors, except that the act adds provisions for housing and relocation assistance to persons displaced by conversions occurring within the limited exceptions to the moratorium.

4. *Third Emergency Cooperative Regulation Act of 1977*, E.A. 2–88, approved October 12, 1977. [24 D.C. Reg. 3177]

This act and accompanying Resolution 2–165, September 13, 1977, 24 D.C.Reg.

---

** This emergency act was passed since the filing of WHOC's complaint and before oral argument, but it replaced E.A. 3–95 *supra*. Since the two acts are substantially identical, we understand that the controversy between the parties was unaffected by the new enactment.

*** The Emergency Cooperative Conversion Act, E.A. 1–90, approved February 6, 1976, and the Second Emergency Cooperative Conversion Moratorium Act of 1976, E.A. 1–112, approved May 6, 1976.

 5583, are virtually identical to those immediately preceding (Act No. 2–47 and Resolution 2–100, *supra* ).

On December 6, 1977, the Council enacted the First Emergency Cooperative Conversion Regulation Act of 1978, E.A. 2–70, following adoption of Resolution 2–224. The provisions of that act and resolution were virtually the same as E.A. 2–88 and Resolution 2–165 *supra.* On January 20, 1978, the Mayor disapproved E.A. 2–70 because of technical deficiencies in the language (and in the language of the similarly-worded permanent legislation then pending on the same subject). In his statement of reasons, the Mayor stated that his action would not adversely affect tenants in the District.

5. *Second Emergency Cooperative Regulation Act of 1978* E.A. 2–171, approved April 3, 1978. [24 D.C.Reg. 9265]

This act was accompanied by Resolution 2–258, February 21, 1978, which notes that the Mayor's disapproval of E.A. 2–70 left a gap in regulation of cooperative conversions, resulting in an emergency because a continued moratorium is needed to prevent chaos. 24 D.C.Reg. 8231. The Act is a revised version of E.A. 2–88, *supra.*

6. *Third Emergency Cooperative Regulation Act of 1978*, E.A. 2–239, approved July 17, 1978. [25 D.C.Reg. 1480]

This act was accompanied by Resolution 2–389, which recites that comprehensive legislation is under consideration in committee and scheduled for public hearings, and that the moratorium must continue to avoid chaos. 25 D.C.Reg. 1786. The Act is identical to Act No. 2–171*, supra.*

7. *Fourth Emergency Cooperative Regulation Act of 1978*, E.A. 2–290, approved October 25, 1978. [25 D.C. Reg. 4332]

This act was accompanied by Resolution 2–447, October 3, 1978. 25 D.C.Reg. 3565. The act and resolution are virtually iden-

tical to E.A. 2–239 and Resolution 2–389, *supra.*

8. *First Emergency Cooperative Regulation Act of 1979*, E.A. 3–2, approved January 25, 1979. [25 D.C.Reg. 7680]

Accompanied by Resolution 3–12, January 16, 1979, 25 D.C.Reg. 7837, this act is identical to its predecessor, E.A. 2–290, except that additional amendments were made to the code provisions governing the Relocation Assistance Office. The resolution is identical to Resolution 2–447, *supra.*

9. *Second Emergency Cooperative Regulation Act of 1979*, E.A. 3–37, approved May 4, 1979. [25 D.C.Reg. 9918]

This act was accompanied by Resolution 3–73, April 10, 1979. 25 D.C.Reg. 9937. The act and the resolution are virtually identical to their immediate predecessors.

10. *Third Emergency Cooperative Regulation Act of 1979*, E.A. 3–79, approved August 3, 1979. [26 D.C.Reg. 642]

This act was accompanied by Resolution 3–170, July 17, 1979, which recites that permanent legislation is before the Mayor and that the moratorium meanwhile must remain in effect to avoid chaos. 26 D.C. Reg. 662. Provisions of this act are virtually identical to E.A. 3–37, *supra.*

On June 5, 1979, the Council adopted permanent legislation in the Cooperative Regulation Act of 1979, which became D.C.Law 3–19 on September 28, 1979, upon expiration of the 30-day congressional review period. 26 D.C.Reg. 1649. This law, containing essentially the same provisions as those included in the preceding emergency act, was adopted by the Council almost three years after enactment of D.C.Law 1–71, the 180-day moratorium which had been intended to gain time for the Council to develop and enact permanent legislation.

C. *Count Three*

On November 29, 1977, the Council passed the Rental Housing Act of 1977, Act

No. 2–118, which generally provides a rent-control plan for the District and regulates sales of rental housing. Upon completion of the congressional review period, it became D.C.Law 2–54 on March 16, 1978, D.C. Code 1979 Supp., § 45–1681 *et seq.* The Council has adopted permanent legislation to amend that law, namely (1) the Offer to Purchase Act of 1979, Act No. 3–75, approved August 1, 1979, which became law on October 18, 1979, 26 D.C.Reg. 1823, and (2) the Multi-Family Rental Housing Purchase Act of 1979, Act No. 3–62, which completed congressional review and became D.C.Law 3–18 on September 28, 1979. 26 D.C.Reg. 1648. The Offer to Purchase Act extends the period which owners must give tenants to consider the purchase of rental property and limits the down payment that may be required to 5% of the purchase price. The Multi-Family Rental Housing Purchase Act gives tenants an extended time for organizing to consider an offer of sale by the owner.

During the interim between the enactment of the Rental Housing Act of 1977 and the two permanent amendments in 1979, the substance of these amendments was enacted in the form of 10 emergency measures:

1. *Emergency Offer to Purchase Act of 1978*, E.A. 2–273, approved September 1, 1978. [25 D.C.Reg. 2545]

Accompanied by Resolution 2–425, August 10, 1978, 25 D.C.Reg. 2078, this act amended sections 601 and 602 of the Rental Housing Act of 1977. The resolution describes inadequacies in the 1977 act and states that an emergency exists in that immediate amendment is needed to prevent tenant evictions and to protect purchase rights of tenants.

2. *Emergency Multi-Family Rental Housing Purchase Act of 1978*, E.A. 2–277, approved October 3, 1978. [25 D.C.Reg. 3419]

Accompanied by Resolution 2–434, September 19, 1978, 25 D.C.Reg. 3450, this act addresses an emergency in the fact that tenants are at a disadvantage in attempting to buy their buildings in the absence of an amendment to section 602(b) of the 1977 act.

3. *Second Emergency Offer to Purchase Act of 1978*, E.A. 2–315, approved December 15, 1978. [25 D.C.Reg. 6120]

This act was accompanied by Resolution 2–471, November 14, 1978, which notes that permanent legislation had been introduced in the Council. 25 D.C.Reg. 5557. This act and resolution are otherwise identical, respectively, to Act No. 2–273 and Resolution 2–425, *supra.*

4. *Emergency Multi-Family Rental Housing Purchase Act of 1979*, E.A. 2–314, approved December 14, 1978. [25 D.C.Reg. 6118]

Accompanied by Resolution 2–463, November 15, 1978, 25 D.C.Reg. 5552, this act deletes section 602(b) of the Rental Housing Act of 1977 and substitutes a new section 602(b). The resolution notes that permanent legislation is under consideration in committee, but that a scheduled recess would prevent enactment of permanent legislation before expiration of the previous emergency act (E.A. 2–277). This situation was said to constitute an emergency.

5. *Second Emergency Multi-Family Rental Housing Purchase Act of 1979*, E.A. 3–15, approved March 13, 1979. [25 D.C.Reg. 8787]

This act was accompanied by Resolution 3–39, 25 D.C.Reg. 8790, which states that committee consideration of permanent legislation continues, and that permanent legislation cannot be enacted before expiration of E.A. 2–314, *supra.* This Act is identical to E.A. 2–314, *supra.*

6. *First Emergency Offer to Purchase Act of 1979*, E.A. 3–16, approved March 16, 1979. [25 D.C.Reg. 8793]

This act was accompanied by Resolution 3–42, 25 D.C.Reg. 8796, noting that permanent legislation had been introduced in

 the Council but would not be enacted prior to expiration of E.A. 2–315, thus creating the need to reenact the provisions of the earlier act.

7. *Third Emergency Multi-Family Rental Housing Purchase Act of 1979*, E.A. 3–53, June 11, 1979. [25 D.C. Reg. 10880]

This act was accompanied by Resolution 3–119, May 22, 1979, 25 D.C.Reg. 10883, recognizing the same emergency as its predecessor (E.A. 3–15, *supra*) and noting that a permanent bill had been reported out of committee.

8. *Second Emergency Offer to Purchase Act of 1979*, E.A. 3–54, approved June 12, 1979. [25 D.C.Reg. 10886]

This act was accompanied by Resolution 3–120, May 22, 1979. 25 D.C.Reg. 10889. This act and resolution are substantially identical to E.A. 3–16 and Resolution 3–42, *supra*.

9. *Fourth Emergency Multi-Family Rental Housing Purchase Act of 1979*, E.A. 3–90, approved August 27, 1979. [26 D.C.Reg. 986]

Accompanied by Resolution 3–179, July 31, 1979, 26 D.C.Reg. 989, this act was adopted after submission of the Multi-Family Housing Purchase Act of 1979, Act No. 3–62, to Congress on July 12, 1979. The Council stated in Resolution 3–179 that the permanent legislation would not become effective before the expiration of E.A. 3–53, *supra*, in September. This was the case because Congress adjourned for a district work period for most of the month of August. This emergency act was intended, therefore, to "fill the gap" between enactment of the permanent bill and expiration of the congressional review period.

10. *Latest Conforming Emergency Offer to Purchase Act of 1979*, E.A.

3–96, approved August 27, 1979. [26 D.C.Reg. 1022]

Accompanied by Resolution 3–205, 26 D.C.Reg. 1026, this act includes the provisions of the previously-enacted emergency bills on this subject, as well as a provision requiring an owner to allow no fewer than 60 days for settlement with a tenant purchaser after the effective date of the purchase contract. Resolution 3–205 noted that the Mayor was expected to sign the permanent Offer to Purchase Act on July 31, 1979, but that, like the Multi-Family Rental Housing Purchase Act, it would not clear congressional review before the expiration of E.A. 3–54, *supra*, in September.

GALLAGHER, Associate Judge, with whom KERN, NEBEKER and HARRIS, Associate Judges, join, concurring:

I concur and wish to add a few comments to the court's holding that the District of Columbia Self-Government and Governmental Reorganization Act (Home Rule Act) D.C.Code 1979 Supp., § 1–146(a) forbids successive enactments of substantially identical temporary legislation directed at a single emergency. The statute provides that emergency acts "shall be effective for a period of *not to exceed ninety days.*"[1] (Emphasis added.) That certainly seems plain enough. The emergency acts are not effective beyond the ninety-day period. The provision of the Home Rule Act admits of only one reading in the context of the statutory and constitutional scheme.

Article I, Section 8 of the United States Constitution commands Congress

To exercise exclusive Legislation in all Cases whatsoever, over such District . . . as may, by Cession of the particular States, and the Acceptance of Congress, become the Seat of the Government of the United States . . . .

---

1. In *SEC v. Sloan*, 436 U.S. 103, 98 S.Ct. 1702, 56 L.Ed.2d 148 (1978), the Supreme Court reached the same conclusion in interpreting a statute with substantially similar language. There the Court held that the Securities and Exchange Commission could not order succes-sive suspensions of trading under a statute permitting it "summarily to suspend trading in any security . . . *for a period, not exceeding ten days.* . . ." *Id.* at 111, 98 S.Ct. at 1708 (*quoting* 15 U.S.C. § 78*l* (emphasis in original)).

In the Home Rule Act, Congress indicated at several points that there was no intention to cede this ultimate authority to the District of Columbia, expressly reserving the right to legislate for the District at any time, including the amendment or repeal of acts passed by the Council, D.C.Code 1978 Supp., § 1–126,[2] subject only to the safety valve granted to deal with emergencies on a temporary basis. To safeguard this power, Congress provided that most permanent acts of the District Council must be transmitted to Congress for a 30-day review period, § 1–147(c)(1). Congress spelled out detailed procedures for concurrent resolutions of disapproval by both Houses during the review period. § 1–127.[3] Its careful attention to the preservation of its oversight role reflects both its responsiveness to the Constitutional mandate and its legitimate interest in the unique national and international considerations in the government of the federal city. Adoption of the position urged by the District would lead to two results which Congress clearly could not have intended.

First, repeated enactments of numerous "emergency" measures would effectively result in permanent legislation in force in the District of Columbia which had never been subjected to Congressional review, a result directly in contravention of the requirements of the Home Rule Act (§ 1–147(c)(1)). The District's argument that Congress' retention of legislative power permits it to step in at any time and amend or repeal an emergency act ignores the fact that in the Home Rule Act, Congress expressly has chosen to exercise its oversight authority over permanent legislation through the 30-day layover provision. To conclude that emergency legislation may be indefinitely used successively would be to permit the Council to avoid the constitutionally required supervision of Congress if by a two-thirds vote of the Council. This is in fundamental conflict with the Home Rule Act and the Constitution.[4]

A second unwarranted consequence of the District's position is that, as a practical matter, a substantial body of laws in force in the District might be effectively insulated from both Congressional and judicial scrutiny. Taken altogether, the District's position results in the proposition that the Council can pass successive emergency acts *ad infinitum*, constrained only by the necessity of obtaining a two-thirds vote every 90 days and the possibility that Congress might step in sua sponte and overrule the emergency legislation. Furthermore, says the District, the Council's finding of an

2. The complete text of this section provides:
 Notwithstanding any other provision of this Act the Congress of the United States reserves the right, at any time, to exercise its constitutional authority as legislature for the District, by enacting legislation for the District on any subject, whether within or without the scope of legislative power granted to the Council by this Act, including legislation to amend or repeal any law in force in the District prior to or after enactment of this Act and any act passed by the Council. [D.C.Code 1978 Supp., § 1–126.]
 Similarly, the purpose section of the statute provides in part:
 *Subject to the retention by Congress of the ultimate legislative authority over the Nation's Capital granted by article I, section 8, of the Constitution*, the intent of Congress is to delegate certain legislative powers to the government of the District of Columbia; authorize the election of certain local officials by the registered qualified electors in the District of Columbia; grant to the inhabitants of the District of Columbia powers to local self-government; to modernize, reorganize, and otherwise improve the governmental structure of the District of Columbia; and, to the greatest extent possible, *consistent with the constitutional mandate*, relieve Congress of the burden of legislating upon essentially local District matters. [D.C.Code 1978 Supp., § 1–121(a) (emphasis added).]

3. If, as a result of several years' experience, the conclusion has been reached by the Council that the statutory ninety (90) day emergency period is not long enough to conclude that particular legislative process, this is essentially a problem for presentation to Congress and not the court.

4. Article 1, Section 8 of the Constitution, *supra*.

emergency would not be subject to court review.[5]

I agree with our dissenting colleagues that in deciding this case the court should first examine the construction which the Council has placed on the Act of Congress we are interpreting.[6] In doing so, however, we should not take a narrow approach, ignoring the vast amount of documentary history before us of the Council's utilization of the Emergency Legislation.[7] After all, in deciding a case of this nature we "need not be blind to what all others know." *Cullinane v. Geisha House, Inc.*, D.C.App., 354 A.2d 515, 518 n.12 (1976).[8] It is only fair to the Council that the broad spectrum of its actions on emergency legislation available to us in this record be examined lest we obtain a false picture from a restricted inspection.

In this court, in this case, the parties have stipulated to 84 instances of the *successive* use of emergency powers. A perusal of the stipulation filed with this court relating to these 84 instances shows the Council has been utilizing emergency legislation to deal with such dubious social emergencies as: regulations relating to ice cream vendors, public alley closings, rental vehicle tax, merit personnel legislation, senior citizen residences sales tax on meals exemptions, and household and dependent care services deduction. In some instances, there have been emergencies declared on the same problem every three months for a period of two and three years.

In a characteristically learned opinion, then Corporation Counsel John R. Risher, Jr. stated not long ago that "while prior to consideration of a proposed act as an emergency measure, the Council as a matter of practice adopts a resolution containing findings purporting to establish the necessary emergency circumstances, *often these findings on their face reveal the absence of 'emergency circumstances,' and that the proposed act[s] are not the proper subjects for enactment as emergency measures.*" Opinion of the Corporation Counsel, The Emergency Legislation Authority of the Council, 1 Op.C.C.D.C. 457, 9 (1977) (emphasis added).

Corporation Counsel Risher had this to say on the subject of repeated enactment of emergency legislation on the same problem

I submit that . . . enacting a fourth bill on basically the same problem on an emergency basis tends to circumvent the intent and purpose of the authority delegated in section 412(a)[9] provisions. As I view section 412(a), it was designed to give the Council power to meet certain crises head on, and thus avoid the lengthier process involved in permanent legislation which cannot become effective until it is first presented to Congress and a period of thirty legislative days have expired. However, section 412(a) *is in this instance being used to continue the effectiveness of "permanent" legislation on an "emergency" basis, a device which strikes me as an obvious circumvention of the Charter.* For these reasons, and the further reason that I do not believe that the Mayor as the Chief Executive should become a party to such procedures, it is my recommendation that the act not be approved. [*Opinion of the Corporation Counsel, Emergency Cooperative Regulation Act of 1976*, 1 Op.C. C.D.C. 424, 2 (1978) (emphasis added).]

In a subsequent opinion, then Acting Corporation Counsel Louis P. Robbins felt

---

5. I doubt the merit of this contention if, for example, the finding on its face reveals the absence of genuine emergency circumstances.

6. I do not agree, however with the second step, *viz.*, the deference doctrine, which the dissent espouses.

7. See Stipulation, filed November 21, 1979, by counsel for all parties.

8. *Cert. denied*, 428 U.S. 923, 96 S.Ct. 3234, 49 L.Ed.2d 1226 (1976), *quoting Burr v. N.L.R.B.*, 321 F.2d 612, 624 (5th Cir. 1963).

9. D.C.Code 1979 Supp., § 1–146(a).

obliged to return to the same theme. In commenting on housing legislation then being proposed, he said

> The second factor is the substantial likelihood that EA 2–133 will be extended by another emergency act if Bill 2–333 is sent to Congress for the 30-day layover period. In that event, we would be called upon to remind you that *this Office considers successive emergency acts to be presumptively invalid.* See Mr. McCally's Memorandum to you dated April 27, 1978. This presumption will attain greater force if the Council again declines to carefully establish a factual basis for such an emergency declaration. [*Opinion of the Corporation Counsel, First Emergency Housing Discontinuance Regulation Act of 1978,* 3 Op.C.C.D.C. 258 (July 27, 1978) (emphasis added).]

It was doubtless utilization such as this of the emergency acts that led former Corporation Counsel Risher to make the prescient observation that

> the *continued abuse of the emergency legislation authority will inevitably lead to judicial invalidation* and, perhaps, a precedent which restricts the District's emergency legislation authority. [*Opinion of the Corporation Counsel, The Emergency Legislation Authority of the Council,* 1 Op.C.C.D.C. 457, 9 (1977) (emphasis added).]

It is evident that to construe the Home Rule Act as permitting indefinite successive utilization of emergency legislation on the same problem would enable the Council to avoid the Congressional supervision which is crucial to the statutory scheme. It would be, effectively, a basic amendment of the Home Rule Act.

Another reason I am motivated to write, however, is to state my disagreement with views in the dissenting opinion on the scope of our review in this case, which I hope do not later obtain currency. I might say preliminarily that in several previous cases, we have exercised our jurisdiction to decide whether the Council exceeded its authority by passing legislation which arguably violated the specific limitations contained in the Home Rule Act. D.C.Code 1978 Supp., § 1–147(a). *E. g., Bishop v. District of Columbia,* D.C.App., 411 A.2d 997 (1980) (en banc) (tax on unincorporated professionals prohibited); *Capitol Hill Restoration Society, Inc. v. Moore,* D.C.App., 410 A.2d 184 (1979) (Council's grant of appellate court jurisdiction in certain noncontested cases impermissibly altered court's jurisdiction); *McIntosh v. Washington,* D.C.App., 395 A.2d 744 (1978) (Firearms Control Regulations Act).

The dissent says that principles of separation of powers and of statutory construction require deference to the Council's interpretation of its power under the Home Rule Act. Specifically, it draws an analogy to a state court (this court) reviewing the validity of a state legislature's (the Council's) action (the emergency legislation) under the state constitution (the Home Rule Act). This analogy is of questionable usefulness and in any event is misapplied. In most of the cases cited by the dissent, the courts rejected a particular reading or application of the legislature's action to save it under the constitution. *See e. g., United States v. Vuitch,* 402 U.S. 62, 91 S.Ct. 1294, 28 L.Ed.2d 601 (1971); *Flemming v. Nestor,* 363 U.S. 603, 80 S.Ct. 1367, 4 L.Ed.2d 1435 (1960); *Anniston Manufacturing Co. v. Davis,* 301 U.S. 337, 57 S.Ct. 816, 81 L.Ed. 1143 (1937). In these cases, the principle of presumptive validity of a legislative action is applied when it is the action itself which is declared to be ambiguous and given a constitutionally saving construction. That is not the case here. In this case, it is the Home Rule Act—the "constitutional" analog—which is found by the dissent to be ambiguous. It attempts to apply the analogy in reverse, *i. e.,* to construe the "constitution" (the Home Rule Act) to save the legislature's action. Deference to the legislative body is not appropriate, however, when the issue is interpretation of the "constitution."

Our dissenting colleagues draw attention to the statement in *United States v. Nixon,*

418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974), that the interpretation of its powers by any branch is to be given great respect (*id.* at 703, 94 S.Ct. at 3105). It would have been instructive to continue on with that passage of the Supreme Court's opinion:

> Many decisions of this Court, however, have unequivocally reaffirmed the holding of *Marbury v. Madison,* 1 Cranch 137 [2 L.Ed. 60] (1803), that "[i]t is emphatically the province and duty of the judicial department to say what the law is." *Id.* at 177 [2 L.Ed. 60].

 \* \* \* \* \* \*

Our system of government "requires that federal courts on occasion interpret the Constitution in a manner at variance with the construction given the document by another branch." *Powell v. McCormack, supra* [395 U.S. 486] at 549, 89 S.Ct. 1944, at 1978 [23 L.Ed.2d 491]. And in *Baker v. Carr,* 369 U.S. [186] at 211, 82 S.Ct. 691, at 706 [7 L.Ed.2d 663], the Court stated:

> "*Deciding whether a matter has in any measure been committed by the Constitution to another branch of government, or whether the action of that branch exceeds whatever authority has been committed, is itself a delicate exercise in constitutional interpretation, and is a responsibility of this Court as ultimate interpreter of the Constitution.*"

Notwithstanding the deference each branch must accord the others, the "judicial Power of the United States" vested in the federal courts by Art III, § 1, of the Constitution can no more be shared with the Executive Branch than the Chief Executive, for example, can share with the Judiciary the veto power, or the Congress share with the Judiciary the power to override a Presidential veto. Any other conclusion would be contrary to the basic concept of separation of powers and the checks and balances that flow from the scheme of a tripartite government. The Federalist, No. 47, p. 313 (S. Mittell ed. 1938). We therefore reaffirm that it is the province and duty of this Court "to say what the law is" with respect to the claim of privilege presented in this case. *Marbury v. Madison, supra,* 1 Cranch at 177 [2 L.Ed. 60]. [*United States v. Nixon, supra* at 703–05, 94 S.Ct. at 3105 (emphasis added).]

It seems to me the fundamental difference between the majority and dissenting view in this case is there discussed. The dissenting opinion here is preoccupied with a doctrine of deference; and the majority view is concerned principally with the proposition that, in the final analysis, it is "the province and duty of this Court 'to say what the law is . . . ,'" the historical doctrine of *Marbury v. Madison.*[10]

Deference to the legislature is appropriate when a legislative action is capable of two readings, one of which would invalidate it and one of which would uphold it. *See Flemming v. Nestor, supra,* 363 U.S. at 617, 80 S.Ct. at 1376. But when the meaning of a statute is questioned it is the duty of the courts, not the legislature, to resolve the issue. In the past, this court did not display any particular reluctance in declaring an Act of Congress unconstitutional. To illustrate, in *Estate of French,* D.C.App., 365 A.2d 621 (1976),[11] this court declared unconstitutional an Act of Congress popularly known as the Mortmain statute, on the ground that it created an unreasonable classification and had no rational legislative purpose. (*id.* at 624–25). I call that a rather strong holding. I see no reason why the court should now be reticent in dealing with actions of the City Council.

If we were to derogate the traditional role of the court in the early stages of this new government, it would bode ill for the expectation of a confident, able, indepen-

---

**10.** 1 Cranch 137, 2 L.Ed. 60 (1803).

**11.** *Appeal dismissed and cert. denied,* 434 U.S. 59, 98 S.Ct. 280, 54 L.Ed.2d 238 (1977).

dent judiciary in this jurisdiction. One hardly needs to labor the importance of an independent judicial branch. Without independence, the judiciary would be merely an appendage of the other two branches. There most certainly should be no meddlesome interference with the other branches of government, but when it comes to interpreting acts of Congress this court should carefully weigh but not defer to the viewpoint of the executive or legislative branches. Not only is the judiciary best equipped to perform the function, but this is perhaps the court's most important responsibility. In the long run, the steady manifestation of the highest traditions of the judiciary will turn out to be profoundly in the best interest of the government, and hence the community.

MACK, Associate Judge, dissenting, with whom NEWMAN, Chief Judge and PRYOR, Associate Judge, join:

The language of the Home Rule Act relating to the issue of successive emergency enactments is ambiguous. The legislative history is both meager and inconclusive. Nevertheless, based on this paucity of congressional direction, the majority has construed the Act as a very restrictive grant of legislative power. I submit such a narrow interpretation should only be made when the legislative history *compels* the conclusion that this was the explicit intent of Congress.

We are concerned here with the statutory construction of a small but vitally important segment of the legislative authority of the District of Columbia Council. There is complete agreement by the parties that a genuine emergency existed necessitating the emergency legislation at issue. We are *not* therefore faced with a charge of abuse of power. We are asked simply to define the limits of power. Specifically, we are asked to interpret whether the phrase "such act shall be effective for a period of not to exceed ninety days" means only one substantive legislative response per emergency

or rather is a temporal limitation on each exercise of legislative power without regard to the substantive terms.

Ordinarily, use of the word "act" in the context of legislation means the exercise of power rather than the content of the legislation. Witness the fact that many statutes of Congress are referenced as Acts—for instance, the "Act of October 15, 1972." And the language of the statute at issue here simply does not restrict the Council from "acting" where there is a finding of emergency circumstances by two-thirds vote. Accordingly, at the very least one must conclude that the statute is not sufficiently clear to warrant a definitive interpretation without turning to the legislative history. There too, we find only brief and inconclusive mention of the issue of successive emergency enactment from which, I submit, no clear statement of congressional intent is discernible. I am convinced that, under basic principles of statutory construction, the Council's legislation can, and should, be upheld. Moreover, in view of the context in which this case arises, I believe we are compelled to rule for the District of Columbia when we apply not only rules of statutory construction, but also principles and presumptions attendant to state constitutional interpretations of the gravest nature.

I.

There is a fundamental canon of statutory construction which mandates that if a statute is fairly susceptible of two constructions, one which will give it effect, the other which would defeat it, the former is preferred. *Anniston Manufacturing Co. v. Davis,* 301 U.S. 337, 351, 57 S.Ct. 816, 823, 81 L.Ed. 1143 (1937). Coupled with this canon is the strong presumption in favor of the validity of actions by the legislature (in this case the District Council). *Flemming v. Nestor,* 363 U.S. 603, 617, 80 S.Ct. 1367, 1376, 4 L.Ed.2d 1435 (1960); *Cobb v. Bynum,* D.C.App., 387 A.2d 1095, 1097 (1978). This presumption attaches not because the

Council has so interpreted its authority, but because it is a legislative body, a coordinate branch whose actions are entitled to great respect.

The purpose of these time-honored principles is to avoid the situation the majority may have wrought here. The determination of legislative intent from a cold record is a difficult, imprecise task. If a court errs in invalidating a legislative act, the error cannot be corrected. The legislature can pass a new statute, but the court's decision is final as to impact and scope. It is a troubling thought that we, in interpreting an ambiguous statute, may have forever foreclosed operation of a valid act. This is a high price to pay for guessing wrong.

And the statute is ambiguous. The language of the Home Rule Act authorizing 90-day legislation by a two-thirds vote of Council members if "emergency circumstances make it necessary" is susceptible to two interpretations. Looking to the interpretation which would give validity to what the Council has done, the language of the Act can be read as a procedural requirement of a two-thirds vote for *each* exercise of power throughout an emergency (as opposed to one exercise). Similarly, the meager legislative history relevant to this section can be read to support this construction.[1] Thus Representative Rees' comments expressing a concern over "hanky-panky" abuse can fairly be construed as indicating that the procedural safeguard of a two-thirds vote was the solution to this potential abuse, rather than a prohibition against dealing with an emergency more than one time.[2]

Given the ambiguity in both the statute and its history, the direction which this court should take is clear. Having found nothing in the statutory language or its history to *mandate* otherwise, and I submit there is nothing there, we should choose the construction that would give effect to the Council's actions. *See United States v. Vuitch*, 402 U.S. 62, 70, 91 S.Ct. 1294, 1298, 28 L.Ed.2d 601 (1971). Instead, the majority has devised an alternative "solution" (for itself, I might say, as well as the Council). It has concluded that we can all avoid the problem of the "second time around" by requiring the Council to enact emergency legislation using permanent legislative procedures. I suggest that the majority, itself, has engaged in legislating and is treading on dangerous ground.

The proposed "solution" is not a solution at all. It begs the issue.[3] It requires the Council, faced with a crisis, to apply a cumbersome procedure, antithetical to the very nature of emergency responses, which Congress could not have intended. It obliterates the difference between "temporary" and "permanent" since the Council, faced with the impossible duty of forecasting the length of an emergency, will be encouraged

---

1. We should be most reluctant to draw the restrictive conclusions of the majority from this legislative history. Only two pages out of the almost 4,000 comprising the *Home Rule History* are devoted to a discussion of successive enactments. Congress simply did not focus its attention on this issue sufficiently to provide us with any reliable guidance.

2. The legislative history of the 1978 Amendments to the Home Rule Act also supports this conclusion. In revising the description of the period for congressional review of permanent legislation, note was made of the fact that under the Act as then written, the District was forced "to enact an inordinate amount of temporary (90-day) 'emergency legislation' that requires no congressional review." H.R.Rep. No. 95–1104, 95th Cong., 2d Sess. at 2 (1978). At the same time that Congress amended this leg-

islative layover section (D.C.Code § 1–147(c)(1)), it also amended § 1–146(a)—the provision at issue here—without making any change in the emergency procedures. When it is show that an interpretation has been brought to the attention of Congress and not changed by it, it is almost conclusive that the interpretation has congressional approval. *Kay v. FCC*, 143 U.S.App.D.C. 223, 231–32, 443 F.2d 638, 646–47 (1970).

3. Contrary to the majority's implicit view, the conclusion that successive emergency enactments are proper under the Home Rule Act does not detract from or negate the need for a permanent legislative process. Both are separate and distinct mechanisms.

to use the permanent track in all cases. Moreover it places on the District of Columbia Council the burden (which we might heartily applaud but which no other legislative body has had to accept)—the mandate, irrevocable, of being absolutely right, the first time, in proposing a solution.

In arguing the feasibility of its approach, the majority relies on the Council's regulations, which, of course, were not in effect when the Home Rule Act was passed. It relies, erroneously, on speculative comments by Representative Rees that the "permanent procedures" *could* be followed if an emergency exceeds 90 days. The fact is that the "permanent procedures" Representative Rees referred to did not include the 30 legislative-day layover for congressional review. The layover provision was added subsequent to the time of the comments by the Congressman. There is no suggestion anywhere in the legislative history that the permanent procedure in the Act as finally passed would be adequate to accommodate continuing emergencies. Absent such a clear statement, we should be very hesitant to impose this construction. The truth of the matter is—and the majority's disposition confirms this—that we simply do not know whether the Council, even under ideal circumstances,[4] could operate effectively by placing emergency matters on a permanent procedural track.[5]

I submit this difficulty could be easily avoided. When a court reaches an impasse in statutory interpretation, it should turn to certain concepts of long standing for guidance. Some of these judicial guidelines are repeated so often as to appear to be "gener-alities." Yet, I cannot think of a set of circumstances that demonstrates more graphically the importance of a court's adherence to such generalities than the present circumstances. Nor can I think of circumstances demonstrating more graphically the folly of devising innovative legislative solutions. The issue here—lost sight of by the majority—is whether the Home Rule Act, *as passed by Congress*, allows successive emergency enactment. The answer is simple under judicial guidelines—given the circumstances here of ambiguous statutory language, not definitively resolved by the legislative history, we give effect to the challenged enactment. The majority, in refusing to meet the issue head-on, has read something into the Home Rule Act that is not there,[6] contrary to principles of statutory construction. *See FTC v. Simplicity Pattern Co., Inc.*, 360 U.S. 55, 67, 79 S.Ct. 1005, 1012, 3 L.Ed.2d 1079 (1959). It has done so without according due weight to the Council's interpretation of its authority to act under the Act—again contrary to principles of statutory construction. *Cf. Udall v. Tallman*, 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965); *Lange v. United States*, 143 U.S.App.D.C. 305. 309, 443 F.2d 720, 724 (1971).

It has acted with only a dim perception of yet another venerable judicial principle: a court must not interpret a statutory provision so as to bring about undesirable or unjust consequences. *United States v. American Trucking Associations, Inc.*, 310 U.S. 534, 543, 60 S.Ct. 1059, 1063, 84 L.Ed. 1345 (1940); *Quinn v. Butz*, 166 U.S.App. D.C. 363, 373, 510 F.2d 743, 753 (1975). The

---

**4.** The majority opinion calculates that under ideal circumstances, these permanent "temporary" acts would become law within 71 days. That leaves only an additional 19 days for the less-than ideal snags inherent in any legislative process before the original 90-day emergency act expires. I do not share the majority's view *that this tight schedule is a feasible alternative.*

**5.** Most troublesome of all, the majority's conclusion relies heavily on the provisions in the permanent track for full public review and participation before an enactment becomes final. Yet, later in the opinion the majority suggests

that these very procedures for public participation be abbreviated so as to pass emergency measures within 90 days. In an effort to fit the square peg of emergency acts *into the round hole* of permanent legislation, the majority suggests that the procedures for permanent legislation be altered.

**6.** The majority, in essence, has added a sentence to the statute: "If the emergency lasts longer than 90 days, the procedures for permanent legislation are to be followed."

potential impact of the majority's decision today is widespread and the repercussions unknown.[7] The plaintiffs did not challenge the substantive validity of the Council's legislation. There is no issue here that a genuine, on-going emergency existed. Yet, the majority has accepted the rationale that because such abuses *might* occur, an issue not factually before the court, Congress could only have intended to mean that *any* successive act was unlawful. These are separate issues. If the validity of the emergency declaration were challenged here, we might be faced with the question of abuse. We should resist the temptation to hastily respond to perceived abuses in other Council actions (*see, e. g.,* Judge Gallagher's statement *ante* at p. 1364) by reading into the Act an absolute prohibition regardless of the merits of the emergency. As a result of this conclusion, the decision will create an untold number of truly aggrieved individuals who have been transacting the business of their lives under now-invalid Council acts. The court's mandate today gives the Council only 90 days to respond to this concern. Predictably at least one response will entail rushed passage of permanent "temporary" measures, using the court's "solution," to buy more time. The court's decision will have created yet another emergency, forcing the Council to put aside its regular pressing business. These adverse consequences argue strongly for a construction that will uphold the Council's actions. *United States v. Powers,* 307 U.S. 214, 217, 59 S.Ct. 805, 807, 83 L.Ed. 1245 (1939).

In any task of statutory construction, particularly one as important as is presented here, we must do more than examine the legislative history of the narrow section at issue. *Kokoszka v. Belford,* 417 U.S. 642, 650, 94 S.Ct. 2431, 2436, 41 L.Ed.2d 374 (1974). Acts of Congress must be interpreted in light of the spirit in which they were written and the reasons for enactment. *General Service Employees Union v. NLRB,* 188 U.S.App.D.C. 119, 124, 578 F.2d 361, 366 (1978). This court has a duty to favor that interpretation of the Home Rule Act that will make its purpose effective, and avoid one which would make its purpose more difficult to fulfill. *See United States v. General Motors Corp.,* 171 U.S.App.D.C. 27, 45, 518 F.2d 420, 438 (1975). We should construe ambiguous provisions with reference to the manifest purpose of the Act. *Zeigler Coal Co. v. Kleppe,* 175 U.S.App. D.C. 371, 381–82, 536 F.2d 398, 408–09 (1976).

The "core and primary purpose of the Home Rule Act"[8] is to "grant to the inhabitants of the District of Columbia powers of local self-government; . . . and, *to the greatest extent possible* consistent with the constitutional mandate, relieve Congress of the burden of legislating upon essentially local District matters." D.C.Code 1978 Supp., § 1–121(a) (emphasis supplied). I would take Congress at its word.[9]

II.

I am troubled by a more basic problem with the majority decision. I think the court has been presented with something more than a task of statutory construction. We have been asked to interpret the enactment from which the District derives its governmental existence. I view the problem therefore as one analogous to constitutional interpretation. The District of Co-

---

7. For example, during the pendency of this appeal, the Federal National Mortgage Association cut off any further funding in the District because an increase in the interest ceiling on home mortgages had been enacted by emergency legislation. Although the parties here have identified emergency legislation in effect at the time the case was argued, we do not have before us any indication of more recent actions taken by the Council.

8. *McIntosh v. Washington,* D.C.App., 395 A.2d 744, 753 (1978) *quoting* D.C.Code 1978 Supp., § 1–121(a).

9. *See, e. g., Kennedy v. City of Newark,* 29 N.J. 178, 186–87, 148 A.2d 473, 477–78 (1959), where the New Jersey Supreme Court liberally construed powers given municipalities under a home rule act, favoring local action.

lumbia Charter forms the basis for all governmental authority in the District. It establishes a three branch system of government with co-equal coordinate departments. The legislative power is "vested in and shall be exercised by the Council" (D.C.Code 1978 Supp., § 1–144(a)), the executive power in the Mayor (D.C.Code 1978 Supp., § 1–162), and the judicial power in the District of Columbia Court of Appeals and Superior Court (D.C.Code 1978 Supp., § 11–431, Appendix). Although some restrictions have been placed over the subject matter on which the Council may legislate, *see e. g., Capitol Hill Restoration Society, Inc. v. Moore,* D.C.App., 410 A.2d 184 (1979), the *powers* conferred are not limited in their scope. D.C.Code 1978 Supp., § 1–124.

The legislative history of Home Rule manifests a congressional intent to delegate to the District powers as broad as its own. The House Committee Report, in explaining the Act's general delegation of legislative powers, noted:

> Congress, in legislating for the District, has all the powers of a state legislature, and Congress may delegate to the District government that "full legislative power, subject of course to constitutional limitations to which all lawmaking is subservient and subject also to the power of Congress at any time to revise, alter, or revoke the authority granted."

*Firemen's Insurance Co. of Washington, D.C. v. Washington,* 157 U.S.App.D.C. 320, 324, 483 F.2d 1323, 1327 (1973) *citing District of Columbia v. Thompson Co.,* 346 U.S. 100, 109, 73 S.Ct. 1007, 1012, 97 L.Ed. 1480 (1953); quoted with approval in Staff of the House Committee on the District of Columbia, 93d Cong., 2d Sess., Home Rule for the District of Columbia 1973–1974 at 1448 (Comm. Print 1974). We may accordingly view the Charter as a broad and undefined grant of authority to the Council, similar to the power of a state, and subject only to the specific limitations enumerated in the Act. [D.C.Code 1978 Supp., § 1–126 (Congressional reservation of authority), *id.,* § 1–127

(Congressional action on certain District matters), 1979 Supp., § 1–147 (Limitations regarding specific subject matter), and 1978 Supp., § 47–228 (Budget process—Limitations on borrowing and spending).]

But whether we characterize the District of Columbia as a municipal corporation, a state government, or something uniquely in between, its lawmaking body is entitled to certain presumptions in reviewing its action. The foremost of these is that every lawmaking body is entitled to a presumption in favor of the constitutionality of its actions. *McDonald v. Board of Election Commissioners of Chicago,* 394 U.S. 802, 809, 89 S.Ct. 1404, 1408, 22 L.Ed.2d 739 (1969); *Flemming v. Nestor, supra; Monarski v. Alexandrides,* 80 Misc.2d 260, 362 N.Y.S.2d 976, 982 (1974). This principle is based on a view of separation of powers which operates to prevent one branch from encroaching on the powers of another. *Union Pacific Railroad Co. v. United States,* 99 U.S. 700, 718, 25 L.Ed. 496, 504 (1879). As a corollary, it is never presumed that a legislative body exceeded its authority or intended to violate the constitution. *Anniston Manufacturing Co. v. Davis, supra,* 301 U.S. at 351–52, 57 S.Ct. at 822–23. Lastly, a general presumption of good faith is attributed to all lawmaking bodies. I think all these presumptions should operate here as we interpret the bounds of the authority within which the Council can function under the Charter.

Placed in this framework, other principles of analysis come into focus in the instant case. Courts should adhere to the principles of judicial restraint when called upon to review the validity of the authority under which a coordinate branch of government acts. Any restriction on broad authority should be read narrowly and no limitations not expressly imposed by Congress should be inferred. The interpretation of its powers by any branch is to be given great respect. *United States v. Nixon,* 418 U.S. 683, 703, 94 S.Ct. 3090, 3105, 41 L.Ed.2d 1039 (1974). Adherence to these principles

is not an abdication of judicial responsibility, but rather a prudent exercise of such authority.

In light of the dictates of these principles, I would view our task as completed once we were assured that the acts in question had met the Charter's technical requirements: that two-thirds of the Council members had voted in its favor, that it was signed by the Mayor, and that it was substantively valid. The Home Rule Act on its face does not impose any additional limitation. I would not search further for a basis to invalidate the Council's actions.

I would take this approach because of the "checks" found in the overall legislative process that are a safeguard against potential abuse. The existence of these "checks" provides a persuasive basis from which to conclude that this limited judicial review of another branch's authority was also Congress' intent. Each act by the Council requires an absolute two-thirds majority vote, an extraordinary requirement, higher even than the vote required to overturn a mayoral veto. Each act expires automatically after 90 days, requiring that the entire enactment process be reexecuted, including a new two-thirds vote. Each act is subject to judicial review for substantive validity. By its terms, the Charter contains an additional "check" on the possibility of legislative abuse by making emergency enactments subject to mayoral veto. Should there be any remaining doubt, the Act reserves for Congress the power to take any action respecting the District. D.C.Code 1978 Supp., § 1–126. Thus persons aggrieved by successive Council enactments have numerous options to redress their concerns through the political branches of both the District and federal governments. Beyond assuring the substantive validity of an act, there is no need, and indeed I think it unwise, for use to offer yet another forum *unless clearly required.*

I think one of the consequences of unnecessarily holding that many of the Council's acts are *ultra vires* is to undermine the effectiveness of the Council. Until Congress provides us with a clear direction that it intended to limit the Council's powers in the manner adopted by the majority, I think we should carefully exercise our authority to encourage the development of the responsible and independent government envisioned by the Charter, accountable most directly to the residents of the District.

