**STATE OF MARYLAND, et al., Plaintiffs,**

v.

**Marion BARRY, et al., Defendants.**

**COMMONWEALTH OF VIRGINIA, et al., Plaintiffs,**

v.

**DISTRICT OF COLUMBIA, et al., Defendants.**

**Civ. A. Nos. 84–3785, 84–3833.**

United States District Court, District of Columbia.

Feb. 28, 1985.

Susan K. Gauvey, Baltimore, Md., for State of Md.

Donald A. Lahy, Asst. Atty. Gen. for Va., for State of Va.

Donald A. Thigpen, Jr., Asst. Corp. Counsel, Washington, D.C., for defendants.

Charles B. Ruttenberg, Arent, Fox, Plotkin & Kahn, Washington, D.C., for defendant-intervenor.

## MEMORANDUM AND ORDER

JACKSON, District Judge.

Attracted by favorable prices reflecting the District of Columbia's lower liquor tax rates, residents of the District's Maryland and Virginia suburbs have for years been travelling to the District to buy, in quantity, distilled spirits they expect to serve or consume at home. Maryland and Virginia revenue authorities, aware that much untaxed liquor enters their jurisdictions from the District but unable, as a practical matter, to halt it without searching every motor vehicle as it crosses the City line, have regularly dispatched their agents to the District to keep watch at liquor stores for vehicles registered in their states being loaded with alcoholic beverages. Once spotted, a suspect vehicle can be followed or apprehended by cooperating agents alerted and awaiting it as it enters its home state. The practice has, not surprisingly, depressed liquor sales by District merchants to would-be suburban smugglers, particularly during holidays, provoking the District to enact protective legislation, the most recent of which is the subject matter of these related (and therefore consolidated) actions for declaratory and injunctive relief. The State of Maryland, the Commonwealth of Virginia, and various of those states' officials involved in the enforcement of their respective revenue laws,[1] ask the Court to declare invalid and enjoin enforcement of certain District of Columbia legislation known as the "State Revenue Officers Registration Act of 1978 Amendment Emergency Act of 1984" (hereafter "the emergency act"). Passed as emergency legislation by the Council of the District of Columbia on December 4, 1984, to be effective December 7, 1984, and remain so for a period of 90 days, the law, as described by Mayor Barry in his letter of

---

1. Maryland, its comptroller, and two state revenue agents, filed a complaint and motion for temporary injunctive relief on December 12, 1984, naming Mayor Marion Barry, the D.C. City Council, Police Chief Maurice Turner, and the 13 members of the City Council as defendants. Maryland has since conceded that the individual council members and the Council itself are absolutely immune from suit for injunctive relief. *See Supreme Court of Virginia v. Consumers Union,* 446 U.S. 719, 100 S.Ct. 1967, 64 L.Ed.2d 641 (1980). Thus, the complaint as to these defendants is dismissed.

Virginia and two of its revenue agents filed their complaint on December 18, 1984. The District of Columbia, Mayor Barry, and Police Chief Turner were named defendants. The cases were consolidated on December 20, 1984.

It is arguable that in suing the District of Columbia, Virginia places this action within the original and exclusive jurisdiction of the Supreme Court. *See* 28 U.S.C. § 1251(a)(1). However, considering the specificity with which Congress typically treats the issue of federal jurisdiction with regard to the District of Columbia, *compare* 28 U.S.C. § 1332(d), this Court is reluctant to hold that the District is a "state" for purposes of § 1251. The Court finds it has jurisdiction over Virginia's action under 28 U.S.C. § 1331 as to the individual defendants Mayor Barry and Chief Turner and does not reach the issue of its jurisdiction to entertain it as to the District of Columbia.

transmittal to the Council, "prohibits state revenue officers [of any state, including Virginia and Maryland] from coming into the District of Columbia for the purpose of conducting an investigation, or surveillance of District liquor stores for possible violations of their states' alcoholic beverage control laws." [2] The cases are now before the Court on cross-motions of the plaintiffs for summary judgment and of the District of Columbia defendants and defendant-intervenors to dismiss.[3] The Court finds sufficient material facts appearing of record to be undisputed for the purpose, and, for the reasons hereinafter set forth, will deny defendants' motions to dismiss and grant plaintiff's motions for summary judgment.

### I.

Despite a history of indifference to, if not cooperation with, out-of-state revenue agents engaged in surveillance in the City since at least the 1950's, in 1978 the Council of the District of Columbia passed the "State Revenue Officers Registration Act," D.C.Code §§ 4–1001–1002, which required out-of-state revenue agents to register with District police not less than 72 hours before entering the District to conduct liquor-store surveillances. Then, in 1983, in response to reports of allegedly abusive conduct by certain visiting revenue agents, the Council amended the law by "emergency" enactment, effective December 21, 1983, to require that out-of-state agents have registered at least 30 days in advance, thus curtailing virtually all surveillance for the 1983 holiday season, most revenue agents not having been sufficiently prescient to have registered that far ahead. The 1983

emergency legislation expired naturally on March 20, 1984, and no further action was taken by the Council until November 21, 1984, when the 30-day registration requirement was reported out of committee in the form of permanent legislation. The bill was passed over, however, and at the urging of the Mayor, the Council then passed yet another "emergency" measure, the emergency act at issue here, effective December 7, 1984, which barred the entry of out-of-state revenue agents for purposes of surveillance altogether.[4] As its legislative predicate the Council found, in substance: (1) that surveillance activities of out-of-state revenue agents had reduced lawful sales of alcoholic beverages in the District, resulting in a concommitant loss of tax revenues to the District "... from persons earning their living in the District ... who otherwise add little to the District's tax base...."; (2) that the surveillance had resulted in "disturbances and harassment" of both retailers and their customers, presenting "a continuing threat to public safety and order"; and (3) that surveillance, if allowed to continue, would have a "negative effect on tourism" in the District.

### II.

Both Maryland and Virginia contend that the District's emergency act violates a multitude of constitutional provisions. Between them they raise the revenue agents' right to travel, their First and Fifth Amendment rights, equal protection, and the privileges and immunities clauses of Article IV and the Fourteenth Amendment.

---

2. Both Maryland and Virginia prohibit the importation of alcoholic beverages purchased out-of-state in excess of certain prescribed amounts. *See* Md.Ann.Code, art. 2B, § 3(a)(2)(ii) (one quart); Va.Code §§ 4–72.1, 4–84 (one gallon or four liters).

3. Mid-Atlantic Liquor Consortium, a trade association, and Central Liquor Stores, Inc., a D.C. liquor retailer, were granted leave to intervene as defendants in both actions.

4. The bill amended the pertinent section of the D.C.Code to add the following:

> No State official shall be allowed to come into the District of Columbia to enforce that State's laws relating to alcoholic beverages, including any law levying a tax on alcoholic beverages, or to conduct an investigation or surveillance at or about any retail liquor establishment or cause to be surveilled activities done in the District of Columbia relating to a possible violation of that State's laws relating to the importation of alcoholic beverages.
> D.C.Code, § 4–1002(a)(2). The penalty for violation of the law is a civil fine of up to $300 for each violation. *Id.,* § 4–1002(d).

They also assert that the emergency act contravenes the Commerce Clause and the Twenty-first Amendment. Neither the parties' research nor that of the Court, however, has turned up a precedent in which one state's efforts to prohibit another's law enforcement officials from performing otherwise lawful duties within its borders has been held unconstitutional, or, for that matter, expressly upheld.[5]

As a general rule, the constitutional guarantees relating to freedom of action and equality before the law are deemed to protect individuals only, and only as individuals, not as agents of a state. *Compare Pennsylvania v. New Jersey*, 426 U.S. 660, 665, 96 S.Ct. 2333, 2335, 49 L.Ed.2d 124 (1976) (per curiam); *Hague v. C.I.O.*, 307 U.S. 496, 514, 59 S.Ct. 954, 963, 83 L.Ed. 1423 (1939) (opinion of Roberts, J.); *Columbia Broadcasting System v. Democratic National Committee*, 412 U.S. 94, 139 & n. 7, 93 S.Ct. 2080, 2104 & n. 7, 36 L.Ed.2d 772 (1973) (Stewart, J., concurring). *See also United States v. White*, 322 U.S. 694, 699, 64 S.Ct. 1248, 1251, 88 L.Ed. 1542 (1944). It is also clear that a state acts only through its agents, *City of Charlottesville, Va. v. Allen*, 240 F.2d 59, 63 (4th Cir.1956), *cert. denied*, 353 U.S. 910, 77 S.Ct. 667, 1 L.Ed.2d 664 (1957), and that peace officers are such agents. *See, e.g., Daughtry v. Arlington County*, 490 F.Supp. 307, 313 (D.D.C.1980).

■ The District's emergency provision, on its face, applies only to "state officials," and D.C.Code § 4–1001(2) defines a "state official" as an "agent, employee, or representative officially responsible for the administration and enforcement of laws of a state relating to alcoholic beverages, tobacco, and tobacco products." Thus, by its terms, the emergency act does not purport to infringe the revenue agents' individual constitutional rights of free speech, travel, association, and the like; the officers are restricted only in their capacities, and to the extent they are acting, as state agents. The legislation leaves them free on their own time to enter the District as may any citizen, and to observe and report anything they see to whom they will while they are there. Thus, neither the state plaintiffs nor their co-plaintiff officials possess any rights under the First, Fifth or Fourteenth Amendments which the proscriptions of the emergency act appear to offend.

Plaintiffs' arguments based upon the Commerce Clause and the Twenty-first Amendment are similarly tenuous. Plaintiffs begin with the assertion that state regulation designed to confer economic benefits on local businesses and residents at the expense of other states is generally impermissible. But, while "simple economic protectionism" may be "virtually *per se*" unconstitutional, *see City of Philadelphia v. New Jersey*, 437 U.S. at 617, 624, 98 S.Ct. 2531, 2535, 57 L.Ed.2d 475 (1978), the Supreme Court has also observed that

> where other legislative objectives are credibly advanced and there is no patent discrimination against interstate trade, the Court has adopted a much more flexible approach, the general contours of which were outlined in *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 [90 S.Ct. 844, 25 L.Ed.2d 174] (1970).

*Id.* at 623–24, 98 S.Ct. at 2535–36. *Pike v. Bruce Church*, in turn, has been explained as holding that

> [i]f ... the state regulation does not seek to distinguish between articles of commerce on the basis of their domestic or out-of-state origins, and the effects on interstate commerce are only incidental, the regulation will be found to burden commerce impermissibly only if, on balance, the benefits sought by the regulating state [do not] outweigh the detriments to interstate commerce.

*U.S. Brewers Association v. Healy*, 692 F.2d 275, 279 (2d Cir.1982), *aff'd mem.*, —— U.S. ——, 104 S.Ct. 265, 78 L.Ed.2d 248 (1983).

■ One ostensible (and ostensibly legitimate) legislative objective of the emergency act is to diminish the likelihood of a

---

5. Maryland suggests that the absence of precedent is explained by the fact that no state has ever before attempted so audaciously to legislate against interstate police activity.

breach of the peace growing out of confrontation between the surveillers and the surveilled. Moreover, not only does the act not discriminate between commodities, it actually enhances rather than inhibits interstate commerce in spirits. To the extent that it serves as an enticement to out-of-state customers to patronize D.C. liquor merchants it promotes an alternative market in competition with those of their home states. As the Supreme Court has held, a state's efforts to keep open channels of free trade, even if for the express purpose of stimulating the local economy, do not transgress the Commerce Clause. *See, e.g., Huron Portland Cement Co. v. Detroit,* 362 U.S. 440, 80 S.Ct. 813, 4 L.Ed.2d 852 (1960); *Western and Southern Life Ins. Co. v. State Board of California,* 451 U.S. 648, 671, 101 S.Ct. 2070, 2084, 68 L.Ed.2d 514 (1981); *Bacchus Imports v. Dias,* — U.S. —, —, 104 S.Ct. 3049, 3056, 82 L.Ed.2d 200 (1984). The fact that the District intended the emergency act to frustrate Maryland's and Virginia's efforts to enforce their own liquor laws enacted pursuant to the Twenty-first Amendment is both incidental and immaterial. The Amendment does not permit one state to foist any part of the burden of enforcing such laws on its sister states. *Cf. Healy,* 692 F.2d at 280–81.

### III.

It appears that comity alone, and not constitutional compulsion, underlies the willingness of the several states to tolerate the presence of foreign law officers within their borders in the performance of their duties. As a matter of common sense, it seems obvious that comity *ought* to attend the relations of sovereign states, if not to the point of mutual assistance to one another in the enforcement of their respective laws, then at least to the extent of refraining from intentional obstruction of the enforcement of those laws which do not offend their own public policy. The emergency act now at issue actually invites citizens of Maryland and Virginia to violate their states' duly-enacted revenue laws, and it cannot be seriously urged that those laws are repugnant to any public policy of the District of Columbia, which has similar laws of its own.

▮ But while notions of comity might counsel against the emergency act, the plaintiffs have pointed to no authority indicating that comity is in any respect obligatory. Rather, the case law seems to point in the opposite direction: the District, as a sovereign, has an inherent right to control the exercise of police powers within its territory.[6] In a recent case, although factually remote from this, the Supreme Court dispelled the suggestion that either comity or the Full Faith and Credit Clause compel any particular degree of respect from one state for another's statutory law. In holding that Nevada may not invoke its sovereign immunity as a bar to an action against it in a California state court, the Supreme Court restated the proposition that

> "Full Faith and Credit does not here enable one state to legislate for the other or to project its laws across state lines so as to preclude the other from prescribing for itself the legal consequences of acts within it."

*Nevada v. Hall,* 440 U.S. 410, 423–24, 99 S.Ct. 1182, 1189–90, 59 L.Ed.2d 416 (1979), *quoting Pacific Ins. Co. v. Industrial Accident Commission,* 306 U.S. 493, 504–05, 59 S.Ct. 629, 633–34, 83 L.Ed. 940 (1939). And in rejecting Nevada's argument that

---

**6.** The states' apparent power to regulate the intrastate operations of foreign police officers is further supported by long-standing statutory provisions governing "fresh pursuit" arrests. A Maryland court, construing such a statute, has observed that it "obviously encompasses a bumper-to-bumper high speed chase across the District line and just as obviously does not encompass looking for a Baltimore City robbery suspect in the District on a mere hunch." *Swain v. Maryland,* 50 Md.App. 29, 435 A.2d 805, 810 (1981). In the absence of cases to the contrary, these statutes, along with the Supreme Court's expressions on the nature of comity as a matter of grace alone, bespeak a consensus that a state, as a sovereign, has power to condition or refuse the entry of foreign peace officers for any purpose having to do with the execution of their official duties.

the Constitution implicitly establishes a system "in which the States are not free to treat each other as unfriendly sovereigns," the Supreme Court said:

> Nothing in the Federal Constitution authorizes or obligates this Court to frustrate [California's] policy out of enforced respect for the ·sovereignty of Nevada....

> \* \* \* \* \* \*

> It may be wise policy, as a matter of harmonious interstate relations, for States to accord each other immunity.... They are free to do so. But if a federal court were to hold, by inference from the structure of our Constitution and nothing else, that California is not free in this case to enforce its policy ..., that holding would constitute the real intrusion on the sovereignty of the States....

*Id.,* 440 U.S., at 426–27, 99 S.Ct. at 1191–92. *Accord Biscoe v. Arlington County,* 738 F.2d 1352 (D.C.Cir.1984), *cert. denied,* —— U.S. ——, 105 S.Ct. 909, 83 L.Ed.2d 923 (1985).

### IV.

■ It is, however, ultimately unnecessary to determine the constitutionality of the District's emergency act at issue here to decide the instant motions, for its infirmity does not derive from any constitutional shortcomings so much as its invalidity as an exercise of the Council's emergency powers under D.C.Code § 1–229(a). It is apparent on the record that circumstances did not warrant the Council's resort to its emergency legislative powers as a vehicle for amending the State Revenue Officers Act of 1978.[7]

In *District of Columbia v. Washington Home Ownership Council,* 415 A.2d 1349 (D.C.1980), the District of Columbia Court of Appeals affirmed a judgment declaring an emergency enactment of the City Council invalid and enjoining its enforcement, saying:

> ... Congress intended the Council's emergency power to be an exception to the fundamental legislative process requiring a second reading and congressional layover; it is not an alternative legislative track to be used repeatedly whenever the Council perceives an ongoing emergency.

> \* \* \* \* \* \*

> We therefore hold that when the Council, by a two-thirds vote after a single reading, enacts legislation in response to emergency circumstances, as authorized by [D.C.Code § 1–229(a) ], that act "shall be effective for a period of not to˙ exceed ninety days," *id., and the Council has no authority to pass another substantially identical emergency act in response to the same emergency.*

*Id.* at 1359 (emphasis added).[8]

The concerns the Council sought to address by the "emergency" legislation involved here are, as were those in *Washington Home Ownership Council,* chronic, not acute. They recur at each holiday sea-

---

7. Under the District of Columbia's Home Rule Act, Pub.L. No. 93–198, Title IV, § 412, 87 Stat. 788 (1973); Pub.L. No. 95–526, 92 Stat. 2023, the District Council is empowered to pass permanent legislation by a majority vote after two readings, at least 13 days apart. . D.C.Code § 1–229(a). If the Mayor does not veto the act within ten days, or if the Council overrides his veto by a two-thirds vote, it becomes effective *only after* a 30 legislative-day layover in Congress, which may vote it down by joint resolution. D.C.Code §§ 1–227(e), 1–233(c)(1). The Council also has authority to pass emergency legislation by a vote of two-thirds of the members if "emergency circumstances make it necessary that an act be passed after a single reading, or that it take effect immediately upon enactment," D.C.Code § 1–229(a), but emergency leg-

islation is,.however, to be effective for a period not to exceed 90 days. *Id.*

8. *Washington Home Ownership Council,* the District argues, is distinguishable in that it involved three nearly identical emergency acts, each passed immediately upon the expiration of its predecessor, whereas the emergency act at issue here expanded the 30-day registration requirement to an absolute prohibition in response to worsening conditions. The distinction imports no difference. The principle enunciated in *Washington Home Ownership Council* is that the Council cannot circumvent the "fundamental legislative process" by resorting to its emergency power in response to a perennial situation.

son, only to go into remission until the next when the demand for alcoholic potables inevitably revives. Yet, following their "emergency" amendment to the 1978 act in December, 1983, to impose the 30-day registration requirement, the Council, anticipating precisely the same situation in December, 1984, rather than timely act on pending permanent legislation, again chose to resort to its emergency powers, thus accomplishing the same result as had the 1983 emergency act: assured absence of inquisitive out-of-state revenue agents during the busy 1984 holiday liquor-buying season.[9]

Such matters are proper subjects for permanent legislation, upon which the full range of the political process can be brought to bear.[10] If it is a sovereign's prerogative to refuse another's request for aid in enforcing its laws, it is also a sovereign's prerogative to enact churlish laws of its own once in a while. But the District of Columbia must legislate within the limited sovereignty conferred upon it by Congress. The citizens of the District are entitled to the alloted time to contemplate the consequences of so provocative an act as the one at issue here. And Congress' reservation of its right to examine the District's proposed laws for its own purposes must likewise be respected. Whether Congress would find the District's emergency act compatible with the place it envisions for the District of Columbia in the federal union is unknown, but it may wish to consider its propensity to incite retaliation by the neighboring states it affronts, and the likelihood of its being emulated by other states, or in other contexts, across the country if it succeeds as intended.

It is, therefore, for the foregoing reasons, this 28th day of February, 1985,

ORDERED, that the motions of defendants and defendant-intervenors to dismiss are denied; and it is

FURTHER ORDERED, that plaintiffs' motions for summary judgment are granted and the State Revenue Officers Registration Act of 1978 Amendment Emergency Act of 1984 is declared null and void; and it is

FURTHER ORDERED, that defendants Marion Barry and Maurice Turner, and their officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with them, are permanently enjoined from enforcement thereof.

---

9. Substantial deference must, of course, be accorded the Council's determination of the existence of "emergency circumstances" sufficient to warrant its circumvention of the hearing and layover provisions of D.C.Code §§ 1–146(a), 1–144(e) and 1–147(c)(1). *See American Federation of Government Employees v. Barry,* 459 A.2d 1045, 1051 (D.C.1983). However, even so limited in the scope of its judicial review, the Court cannot conclude that the record and legislative history of the 1984 act establishes justification for emergency action. Even the "harassment" which gave rise to the Council's professed fear for the public order if foreign revenue agents were not restrained, so far as appears from the record, appears to have been nothing more than the discomfiture of out-of-state customers of D.C. liquor stores at being observed buying potential contraband and the merchants' ire at losing their business, but nothing of a magnitude to suggest that the District's own police officers would have been unable to handle the situation.

10. The District of Columbia Court of Appeals has held that the purpose of the second reading requirement is to provide notice of and an opportunity for hearing on a pending legislative proposal. Similarly, the layover requirement was established as a safeguard to assure Congress an effective means of carrying out its constitutional responsibility under Article I to legislate for the District. *District of Columbia v. Washington Home Ownership Council,* 415 A.2d at 1352, 1357–58.