**BEECH AIRCRAFT CORPORATION, Plaintiff,**

v.

**Edwin S. HARRIS, Donald D. Engen, Federal Aviation Administration, Elizabeth Dole, Defendants.**

**No. 86–0349–CV–W–6.**

United States District Court, W.D. Missouri, W.D.

April 4, 1986.

Supplemental Memorandum And Order April 8, 1986.

Reed O. Gentry, Field, Gentry, Benjamin & Robertson, Kansas City, Mo., Douglas N. Ghertner, Martin, Pringle, Oliver, Wallace & Swartz, Wichita, Kan., for plaintiff.

Vernon Poschell, Asst. U.S. Atty., Kenneth Geier, Kansas City, Mo., for defendants.

## MEMORANDUM AND ORDER

SACHS, District Judge.

Plaintiff ("Beech") seeks to restrain defendant federal officials from making public distribution of a printed document bearing a January 1986 date, which reproduces a report by a Department of Transportation research organization, Transportation Systems Center ("TSC"), to the Federal Aviation Administration ("FAA"). The report concerns several safety issues relating to a Beech aircraft, Model 35, known as a V–Tail Bonanza. Production of this model has been discontinued, but perhaps 10,000

planes remain in operation in the United States and overseas.

A preliminary draft of the report, which is itself a preliminary document awaiting further testing results, was "leaked" to a trade publication, *The Aviation Consumer*, and portions of the study were published under date of December 1, 1985. Beech contends there are serious unscientific and irresponsible errors in small but critical portions of the report, and that release of the report as a public document will create unwarranted alarm among pilots and users of the aircraft, particularly if certain phrases are quoted out of context. Beech is presently subject to about fourteen product liability lawsuits relating to the V–Tail Bonanza, and fears unwarranted refueling of litigation, misleading use of the document in evidence, economic harm, and serious difficulties in obtaining further product liability insurance.

Suit was filed in Kansas City because FAA has a regional office here, and the request for the report came from the FAA Small Aircraft Directorate, which has its headquarters here. Kansas City is the intended distribution point of the 300 copies of the report that have been printed. Beech and other small aircraft manufacturers are located in Wichita, Kansas. Plaintiff asserts federal question jurisdiction as well as jurisdiction under the Administrative Procedure Act. 28 U.S.C. § 1331, 5 U.S.C. §§ 701–6. While the federal defendants strongly resist judicial interference with their discretion to publish and distribute a report deemed to be in the public interest, jurisdiction has not been challenged.

A temporary restraining order was issued upon the filing of litigation last month, requiring defendants to withhold supplying materials in response to requests under the Freedom of Information Act, 5 U.S.C. § 552. At the end of the initial hearing on the motion for a preliminary injunction, the restraining order was continued and enlarged to forbid, temporarily, the public or private distribution of the report by defendants.

As of the recess of the hearing on March 21, 1986, plaintiff had demonstrated serious questions about the soundness of two portions of the report, one dealing with the aerodynamic lift characteristics of the wings of the aircraft and the other relating to the structural strength of the tail. The report was premised on only 2% of the lift being carried by the fuselage, whereas plaintiff initially calculated in the 1940s that the fuselage would bear 16% of the burden and current data shows that the fuselage does carry some 12–14.5%. Testimony offered by defendants' expert witness, Terence Barnes, seemingly confirms this serious deficiency in the report, which may tend to create unwarranted doubts relating to the soundness of design of the wing structure of the V–Tail Bonanza and other aircraft.

A further critical issue concerns the tail "maneuvering limit envelope." The report *assumes* there could be structural failures during anticipated flying conditions. Mr. Barnes agrees with plaintiff's expert, William H. Schultz, that the report makes unwarranted assumptions, but Barnes does have some reservation, on present information, about possible failures during unanticipated but realistically conceivable flying conditions, not far removed from the anticipated flight "envelope."

While the report lists significant numbers of in-flight structural failures of the V–Tail Bonanza, it confirms that the aircraft did meet all certification requirements when first manufactured, and there is no question raised concerning this aircraft's compliance with current standards. The most troublesome issue presented is whether FAA's current airworthiness standards for general aviation aircraft are adequate to the proper certification of "non-conventional tail aerodynamic configurations." Recommendations of the report include (1) a further review of pertinent FAA standards, (2) a review of pilot certification requirements for "high performance, single-engine aircraft," and (3) further limited testing to permit more definitive conclusions.

After Beech's pre-litigation objections to the TSC report threatened a confrontation, FAA prepared an accompanying forward, dated March 7, 1986, referenced by rubber-stamp addition to the printed report. FAA states that the report identifies "no immediate safety concerns, provided the airplane is operated within the approved flight envelope. Therefore, no mandatory airworthiness or other immediate action is being considered at this time." FAA criticizes the TSC report in several aspects, and asserts that "TSC used a simplified method (in calculating lift) that is inconsistent with the methodology generally accepted by the aviation community and FAA certification engineers." FAA also notes that "TSC acknowledges in the report" that the assumed conditions that "would cause the tail to exceed limit loads" might not be "attainable in actual operation." FAA states that the results of the TSC analyses are "retained, however, to maintain the independent nature of the report."

Beech's major concerns about the report deal with only a few pages in a document exceeding 100 pages in length. A much longer second document relating to accident reports is not challenged. It does appear, however, that the subject matter of the challenged portions is critical to opinions about the structural soundness of the V–Tail Bonanza. Beech has, moreover, supplemented the testimony at the hearing with a twelve-page critique, submitted as an in camera response to interrogatories.

Additional affidavits and exhibits were received in open court on March 29, 1986. Testimony was also heard from Barry D. Clements, FAA's Manager, Aircraft Certification Division, the author of the new forward to the report. He does not now appear to concede that portions of the report are as faulty as seems indicated in the forward that he signed. Although not an engineer, he did offer a plain-spoken testimonial endorsement of the general safety of the V–Tail Bonanza, observing simply that FAA does not consider it to be an unsafe aircraft.

Requests for copies of the report were admitted into evidence, as bearing on the public interest in a release of the report. Typical of the requests are the five that have been received in 1986. Two are from unidentified members of the public; one is from the American Bonanza Society, which initiated the inquiry; one purports to be from "an active flight instructor and Bonanza pilot" who says he anticipates that "the report will be useful in my research" on "the structural integrity of the Beech Bonanza;" and one is from "Air Transportation Consultants, Ltd." The 1985 inquiries include some half dozen requests from lawyers and one from Western Beech Bonanza Owners Society. While the inquiries contain hearsay, they are of a variety that the court might have anticipated as a matter of judicial notice.

An affidavit has been filed by George Neat, Deputy Associate Director, Office of Technology Applications, Transportation Systems Center, who takes responsibility for the TSC study. He states that the draft report, not changed in the final report, concluded that "the wing was sufficiently strong to meet certification requirements and recommended no further study." He further states that "the TSC report concluded that a test program was necessary to provide the data to determine conclusively whether the design of the V–Tail Bonanza was or was not deficient." This statement, reflecting the most ominous TSC conclusion, is now a matter of public record, and mere republication can hardly prove harmful to Beech.

Mr. Neat attempts to justify, in several pages, the TSC procedures and rationale on the two most controversial issues on which Mr. Barnes of FAA appears to have agreed with Beech. It is not possible, without live testimony and cross-examination, to attempt to evaluate the issues between Beech, Mr. Barnes and Mr. Neat, and it is not necessary at this stage of the litigation to determine whether some post-release corrective action should be judicially required or is likely.

Beech asks the court to suppress distribution of the report because it contains serious, demonstrable errors, even in the opinion of FAA experts, and because the

testing recommended by the report is now in process and a final report can be expected in a matter of months. Mr. Clements anticipates that a final report would not be available for eight or nine months; the Government contends that would be too long to delay public reporting on a project that started in 1984.

## I. FIRST AMENDMENT; PRIOR RESTRAINT

Regardless of the intrinsic merits of plaintiff's claim, a serious question exists concerning the court's authority to process litigation seeking a prior restraint or "gag order" limiting distribution of a Government publication.[1] It has been said that "the courts may no more enjoin Government departments from issuing statements to the public than they may enjoin a public official from making a speech." *Bristol-Myers Co. v. F.T.C.*, 284 F.Supp. 745, 748 (D.D.C.1968) (Holtzoff, J.). On appeal, however, the court of appeals, speaking through Chief Judge Bazelon, affirmed the decision below but expressed "regret" concerning the "broad dictum suggesting that an agency could never be enjoined from publicizing its activities." *Bristol-Myers Co. v. F.T.C.*, 424 F.2d 935, 940 n. 21 (D.C. Cir.), *cert. denied*, 400 U.S. 824, 91 S.Ct. 46, 27 L.Ed.2d 52 (1970). *See also Silver King Mines, Inc. v. Cohen*, 261 F.Supp. 666 (D.Utah 1966) (enjoining certain SEC news releases). There is a surprising dearth of cases on this subject, and none from recent years. Note, however, one recent decision cited by plaintiff having tangential bearing on the subject. *State of Maryland v. Barry*, 604 F.Supp. 495 (D.D.C.1985).

■ Subsequent to the *Bristol-Myers* litigation, the Supreme Court has applied First Amendment guarantees to organizational speech. *First National Bank of Boston v. Bellotti*, 435 U.S. 765, 98 S.Ct. 1407, 55 L.Ed.2d 707 (1978). "The inherent worth of the speech in terms of its capacity for informing the public does not depend upon the identity of its source, whether corporation, association, union or individual." 435 U.S. at 777, 98 S.Ct. 1416. First Amendment freedoms may be invoked by corporations, unions, or "like entities." 435 U.S. at 778 n. 13, 98 S.Ct. at 1416 n. 13. The rationale presented is that the public has a right to information supplied by such organizations; this creates First Amendment rights irrespective of whether organizations as such are deemed to be beneficiaries of all entitlements under the Bill of Rights.

■ While judicial rulings offer no further guidance, I have little doubt that the FAA and the TSC should be treated as "like entities." If a university publication cannot be subjected to prior restraints, it is difficult to see how a TSC report could properly be suppressed.[2]

■ In a recent dissent from the Court's further expansion of corporate First Amendment rights, Justice Rehnquist described the *Bellotti* ruling as one establishing that "the First Amendment prohibits the Government from *directly* suppressing the affirmative speech of corporations." *Pacific Gas & Electric Co. v. Public Utility Comm'n of California*, —— U.S. ——, 106 S.Ct. 903, 917, 89 L.Ed.2d 1 (1986) (emphasis in the original). It seems rea-

---

**1.** Government counsel initially attempted to avoid this constitutional issue. As in a jurisdictional question, however, I cannot proceed to violate constitutional rights, if any, simply because the parties prefer not to join issue on that question. Before closing files and conducting *in camera* proceedings, for example, I must consider First Amendment rights.

**2.** The *State of Maryland* decision cited by plaintiff does not deal with the First Amendment rights of the public and thus does not offer helpful direction in this case. *Houchins v. KQED, Inc.*, 438 U.S. 1, 98 S.Ct. 2588, 57 L.Ed.2d

553 (1978), deals with news media demands for information which were rejected by a closely divided Court, relying in part on executive and legislative discretion. This is hardly a precedent for stopping disclosure when there is a public interest in the information and the agency wishes to be heard. When, as here, the communication qualifies for First Amendment protection and there is a "willing speaker," both potential recipients and the "source" may invoke the Constitution. *Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 756, 96 S.Ct. 1817, 1822–23, 48 L.Ed.2d 346 (1976).

sonable to expect that the Court has now reached a doctrinal position where it would adopt Judge Holtzoff's view, as expressed in 1968. Government officials and agencies are entitled to speak and to inform the public without obtaining permission from the federal judiciary. If the constitutional prohibition on prior restraints in this context is not absolute, sound exceptions to the prohibition are difficult to imagine.

## II. INSUFFICIENT DEMONSTRATION THAT PRIVATE HARM EXCEEDS PUBLIC BENEFIT

■ Reasoning in the alternative, because of the novelty of the constitutional question, even if it were ruled as in *Silver King Mines* that the court has authority to suppress public speech in the Executive Branch, I must conclude that such restraints would be reserved for a more extreme situation than has been demonstrated here. The Supreme Court has sanctioned *subsequent* corrective action in equity when an exercise of agency speech may be characterized as "administrative discretion ... run riot." *Joint Anti-Fascist Refugee Committee v. McGrath*, 341 U.S. 123, 138, 71 S.Ct. 624, 631, 95 L.Ed. 817 (1951). Some such extraordinary abuse of discretion would doubtless be needed before judicial prior restraints could be imposed. Simply because I might believe that poor judgment is being exercised would not suffice to authorize a substantial prior restraint.

■ Beech contends it has satisfied the requirements for a preliminary injunction generally, as set forth in *Dataphase Systems, Inc. v. CL Systems, Inc.*, 640 F.2d 109 (8th Cir. en banc 1981). It is true that any harm from the publication would be irreparable, impossible to compensate in damages under the Tort Claims Act, 28

U.S.C. § 2680(h). Little direct harm to defendants or their agencies would occur if the present preliminary report were confined to internal use of FAA. The likelihood that Beech will receive some relief is debatable, but the litigation does have some substance, based on the evidence and the availability of subsequent judicial remedial authority, as established in the *Refugee Committee* decision, *supra*. See also *B.C. Morton Int'l Corp. v. FDIC*, 305 F.2d 692 (1st Cir.1962). Defendants have not yet offered a convincing defense of the engineering soundness of the two major points in the report that are targeted by Beech.[3]

The problem Beech fails to overcome is the public interest, as weighed against its own private interest in suppressing the public distribution of the report. In placing these interests on the scales, for comparison, Beech needs to face the potential current uses of the report, which somewhat limit the remaining weight of its realistic interest in prohibiting further distribution.

■ Even if release of the report to litigants is delayed or blocked under the Freedom of Information Act, I have little doubt that the printed report of January 1986, like its earlier draft version, can readily be obtained from Beech (at least under a protective order) in discovery.[4] Thus, the claimed need to suppress publication, as it relates to litigation, seems exaggerated.

The general counsel of Beech has testified that suppression of the report is also of critical importance to procuring product liability insurance covering any future accidents involving the V–Tail Bonanza. His testimony was candid and credible, and counsel's sense of urgency is appreciated, as well as his exasperation that damaging

---

**3.** It may be noted, however, that Secretary Dole is the only defendant who has any direct or indirect responsibility for the quality of the TSC report. FAA distances itself from the report by treating it as simply the product of an independent scientific entity. It is a report *to* FAA, not *by* FAA.

**4.** I do not mean to suggest that all portions of the report could likely be used in evidence, under Rule 803(8)(C), F.R.Evid. On the con-

trary, the report's assumption of minimal fuselage contribution to lift seems to lack trustworthiness, under the evidence so far presented. The assumption of possible failure of the tail structure *within* the "maneuvering limit envelope" will also probably be deemed to lack trustworthiness or at least to present the likelihood of confusion exceeding any legitimate use, thus requiring live expert testimony rather than evidentiary use of that aspect of the report.

questions should be publicly aired by the federal government in advance of test information. But the TSC report has been made, even though only in a "Phase I" mode, and a copy of the report is in the hands of Beech. This litigation has established the fact (in the Neat affidavit) that TSC recommends further testing before a possible design deficiency in the V–Tail Bonanza can be conclusively evaluated. Beech would be expected, either as a legal requirement or simply as a matter of good faith dealing with insurers and potential insurers, to share with the insurers what has now been reported to it. There is no secret that Beech has reviewed a draft of the report; it is now no secret that the printed report is in its hands. Whether or not there is public distribution of the 300 printed copies would seem to have little or no pertinence to the insurance issues, unless the court should speculate that mere publicity could be the final straw that might break the camel's back.

█ Beech also suggests that it may suffer general economic harm as a result of public controversy triggered by the report. This depends, in part, on how the report is handled by the news media. An assumption of misreporting will not be made. In balance, and particularly with the FAA forward, the report appears to be somewhat reassuring as to the aircraft's compliance with all currently applicable FAA requirements. The troubling accident record has apparently long been known. No fault is explicitly attributed to Beech, however, and the V–Tail Bonanza is not considered by FAA to be an unsafe aircraft. If implied criticism is raised by the report, it seems to be directed toward whether FAA has kept current with its responsibilities. This is a matter that deserves public airing. Release of the report may be viewed as a commendable exercise in self-criticism or (more likely) as a low-key bid for adequate funding.

There are obvious and strong public interests favoring release of the printed report. Pilots and users of the V–Tail Bonanza are entitled to prompt release of safety information. Present or potential claimants would include the unsophis-ticated, who may find the published report useful, particularly in the reference pages (105–9) at the end which serve as a bibliography for further study. While Beech believes the report has been unduly influenced by professional enemies of the V–Tail Bonanza, particularly Dr. Brent W. Silver and Professor Ronald O. Stearman, it would be intolerable censorship for the court to deny access to advocates who may be hostile to the Beech aircraft.

The only consideration that might give the court some pause is whether Beech may be entitled to a more carefully reasoned, formal explanation of why FAA deems the public interest in distribution of the report to exceed the private interest in maintaining it as an internal document while awaiting a more definitive study. If Beech itself were the source of the report, and if this were a Freedom of Information Act proceeding seeking to force disclosure by the Executive, there would be authority for remanding the questions to the agency. *General Electric Company v. United States Nuclear Regulatory Commission*, 750 F.2d 1394 (7th Cir.1984). As Judge Posner observes, however, it is surely possible to "overjudicialize the administrative process." 750 F.2d at 1402. A requirement of minutes showing the decisional process or for a formal written agency analysis weighing the interests for subsequent judicial oversight seems unwarranted by the precedents or the principles involved.

The motion for a preliminary injunction is DENIED. At the request of Beech the restraining order shall remain in effect for an additional period of twenty-one days if a notice of appeal is filed within seven days. SO ORDERED.

No further extension of a restraint or stay pending appellate review will be granted by this court, but further relief may be sought in the court of appeals.

## SUPPLEMENTAL MEMORANDUM AND ORDER

Plaintiff requests an amendment or supplement to the facts set forth in the Memo-

randum and Order filed April 4, 1986. In light of plaintiff's need to seek almost immediate relief on appeal a summary response will be given.

Plaintiff requests that I question or challenge portions of the George Neat affidavit that were quoted in the ruling. No useful purpose would be served by this exercise.

Plaintiff avers that the printed report signifies a TSC conclusion that "the aircraft is dangerous to fly," and that "the aircraft *does not* meet or comply with current standards and regulations." These conclusions are drawn from the report's alleged theories that "only two (2%) per cent lift (is) carried by the fuselage" and that "the tail structure will fail at maneuvering speeds or below." These conclusions seem to be overstatements, not appearing in the printed report,[*] and are inconsistent with FAA's forward to the report as well as the FAA testimony which will receive adequate coverage in the Federal Supplement when the April 4 ruling is published.

At worst, the tail structure theory of TSC seems to present an unfortunate hypothesis, not a known fact. Mr. Neat's affidavit states that the task force may have used an "overly conservative" figure of 2% as an estimate of the fuselage lift contribution "for an angle corresponding to dive speed." He recites that the task force calculation method produced an "estimate of 14% at cruising speed." Whether this would be contrary to current standards and regulations is not clear to me, and no citation is supplied. In any event, the 2% figure appears to be seriously questioned by FAA in the forward to the report that will accompany the report. Beech does not deny that Mr. Clements has now testified that FAA does not consider the V–Tail Bonanza to be an unsafe aircraft, and this statement will be published for the benefit of any serious researcher.

---

[*] The fuselage lift statement is most nearly a direct quote from the report, but is qualified when read in context.